## UNITED STATES v. AUSTIN.
### Civ. No. 4368.

United States District Court
D. Maryland.
Jan. 24, 1951.

8. Pennsylvania Steel Co. v. New York City Ry. Co., 2 Cir., 198 F. 721, 749;

In re Wolf Mfg. Industries, 7 Cir., 56 F.2d 64, 67.

Bernard J. Flynn, U. S. Atty. for the District of Maryland, Baltimore, Md., for plaintiff.

Green, Whalin, Babcock & Bell and Walter L. Green, Hyattsville, Md., Robert

E. Coughlan, Jr., Baltimore, Md., for defendant.

## CHESNUT, District Judge.

In this case the United States sues the defendant under the Second War Powers Act of 1942, as amended, 56 Stat. 176, 177, Title 50 U.S.C.A.Appendix, § 633, and Executive Orders issued thereunder implemented by Priorities Regulation 33 issued by the Civilian Production Administration effective January 15, 1946. The object of the suit is to obtain, in lieu of an injunction against alleged violation of the regulation, restitution of alleged over-ceiling charges made in the sale of certain houses, and also monetary compensation to the purchasers in lieu of specific performance to correct alleged deficiencies or omissions in the construction of the houses. In the complaint the United States also relies upon alleged violations of regulations issued under the Veterans' Emergency Housing Act of 1946, 50 U.S.C.A.Appendix, § 1821 et seq., under which the Housing Expediter continued with some change the provisions of Regulation 33 above mentioned, until the termination of the Housing Act on December 31, 1947. However, it is not disputed that the termination of the effective regulation under the Second War Powers Act does not bar this suit for alleged violations occurring while it was in force. United States v. Carter, 5 Cir., 171 F.2d 530. The answer of the defendant denies the violations. From the evidence in the case I make the following findings of fact.

On March 12, 1946 the defendant Austin signed largely in blank, an "application for prefernce rating reconversion housing program under Priorities Regulation 33 as amended". This was less than two months after the effective date of the regulation and apparently before the practical administration of the particular government agency had been well organized. At the same time he filed another similar application. Each referred to the projected building of ten five-room bungalow houses on Byers Street in Prince George's County, Maryland, only a mile or two outside of the District of Columbia. In each application just above the defendant's signature appeared the following printed matter:

"I, the undersigned hereby certify that I am the applicant, or that I am authorized to execute this application on behalf of the applicant, and that the facts herein set forth or attached are true and correct to the best of my knowledge and belief. I further certify that I will construct the project in accordance with the description given in this application, that I will observe the restrictions on sales prices and rents to be charged for the dwelling units as specified in items 4 or 5 of this application, that I will give preference to veterans in selling or renting the units and that I will comply with all other provisions of Priorities Regulation 33 and other applicable orders or regulations in the construction and disposition of the dwelling units covered by this application."

Only ten of the projected twenty houses were ever built because the defendant lost money on the sales of them and discontinued. The defendant had been a carpenter for thirty years prior to this date and had never before built a house as a contractor or for sale. He was quite inexperienced in that work, and is a man of only limited education and financial resources. In the first application he specified the maximum sales price per unit was to be $9500, and in the second $10,000. He filed with the application some plans he had borrowed from a friend who had recently constructed a somewhat similar house. He himself apparently was not a draftsman or competent to prepare plans in detail.

In order to obtain the forms for the application he went to a building which he understood to be that of the Veterans Administration at 15th and M Streets, Washington, D. C., but which it appeared was only the temporary location of the Federal Housing Administration at the time, not far from the Veterans Administration. He conferred with a young woman secretary or clerk who gave him the applications on which he wrote his name and the proposed location of the houses. On the reverse side of this application there is what purports to be four columns of specifications for the

houses. The secretary said she would fill them out and the cross-marks that appear on the applications in evidence were made by her, presumably from her understanding of her talk with the applicant. Only a small part of the writing appearing above the defendant's signature was made by him, including in the first application the words "asbestos shingles" and "floor area of 816'–O'"." And similarly with regard to the other application. It is said that it was the custom of the office at the time to have these applications made in triplicate but no copies were sent to the defendant when, on April 2, 1946, he received the official authority for priority orders to obtain material for one project ending with numerals 340, and 341 for the other. The orders reduced the ceiling prices for the houses to $9250 and $9800 respectively. He proceeded promptly with the project of building some of the houses which were in the nature of a one-story bungalow with an unfinished attic. Some of the material for the houses was obtained by him without the necessity of using the priority order; but for other materials that he needed covered by the priority order (known as HH) he found it impossible to obtain the materials despite the authority of the priority orders. In this situation he again went to the office of the Federal Housing Administration and saw the same secretary who referred him to another representative of the agency, whose name he did not get at the time. He requested the agent to assist him in obtaining the materials for the houses and received the perhaps very natural reply that the agency could not do that but merely gave him the priority to get the materials if he could obtain them from wholesalers who had them available. The defendant estimated that for the aggregate cost of the ten houses that he built at the approximate cost of about $90,000, including materials and labor, the cost of materials that he was able to purchase on the priority order was not more than $10,000.

The defendant said without contradiction or impeachment that the last mentioned agent of the Federal Housing Administration with whom he conferred, told him that if he was unable to obtain the materials to build the houses in accordance with his plans, he should simply go ahead and build the best houses he could, and after they were completed they would be appraised by the Veterans Administration and could be sold at the price of such appraisals. Without further communication with the Federal Housing Administration he proceeded to construct the rest of the ten houses and, as they were respectively ready for sale, he engaged the Hartman Sales Agency of Washington to sell them. The name of their representative was Fillipo. In the matter of the sale of each house Fillipo first had the house appraised by the Veterans Administration in connection with proposed sales of the house to a veteran, and the financing of the purchase price with the guarantee of the Government under the Veterans' Act. All sales so made by Fillipo for the defendant were made in accordance with the appraisals, which, in a few cases were for an amount greater than the ceiling price but in more cases at a price less than the ceiling price. While the defendant was aware that ceiling prices had been fixed by the Federal Housing Administration for his houses, he apparently understood in good faith that that feature of his priority orders was in substance abandoned and the Veterans Administration appraisal substituted therefor. Whether the defendant was justified in acting on this assumption is to be decided, but that he was acting in good faith in his understanding I think is true after hearing his oral evidence and observing his demeanor as a witness.

The Government asks restitution to the purchasers of the houses for (1) over-ceiling prices charged in two instances and (2) monetary value of construction defects as compared with plans and specifications in 9 of the 10 houses. Nothing is demanded with respect to the tenth house because as a matter of policy the Government decided not to do so in view of the fact that the original purchaser had voluntarily resold the property at a profit.

Only two of the houses were sold at a price in excess of the ceiling price approved by the Federal Housing Administration.

One house so sold was No. 5212 Byer Street, to B. J. Johnson for $11,500, which included a note for $300 which has not been paid. The ceiling price for this house was $9,800 and the Government claims restitution in the amount of $1400. Johnson's house had been appraised by the Veterans Administration at $11,500. Another sale was to Waldron who purchased 5123 Byer Street for $11,500, $750 of which was represented by a note on which $250 only has been paid. That house had also been appraised by the Veterans Administration at $11,500. Four houses were sold at prices under the ceiling price being respectively at $800, $250, $100 and $500 less than the ceiling prices, or a total of $1650. As to the latter the Government of course does not ask for any restitution for over-ceiling prices but does ask for them and for each of the 5 other houses (9 in all) monetary damages for alleged building defects or deficiencies as per the plans and specifications, but it is conceded that the difference between the authorized ceiling price and the smaller actual sale price should be credited against the amount of damages awarded for building deficiencies.

With respect to the monetary value of the deficiencies, there has been evidence offered with regard to two houses only, one at 5123 Byer Street and the other at 5118 Byer Street. It was agreed by counsel that these two houses should be selected as tests for the amount of deficiencies for the other houses of the same respective classes. For convenience counsel for the United States has prepared a memorandum of the claimed itemized deficiencies with respect to these two test houses. It is as follows:

| Item No. | Reference | Description of item | As specified | As built | FHA. Valuation |
|---|---|---|---|---|---|
| (5123 Byer St. (Serial 6000-00340) Brick Veneer | | | | | |
| 1 | Plans & Appl. | Size of House | 26′ x 36′ | 24′ x 36′ | $152.73 |
| 2 | Plans | Parging basement walls | ½″ cement plaster | None | 41.23 |
| 3 | Plans | Girder supporting 1st floor | 8″ steel-I-Beam | 3–2″ x 8″ wood | 41.21 |
| 4 | Plans | Basement windows | 6 | 4 | 21.94 |
| 5 | Application | Heating system | Hot water | Hot air | 198.61 |
| 6 | Plans | Fireplace | Yes | None | 392.02 |
| 7 | Plans | Floor joists, 1st floor | 2″ x 10″ 16″o.c. | 2″ x 8″ 16″o.c. | 32.23 |
| | | | | | $879.97 |
| 5118 Byer St. (Serial 6000–00341) Asbestos Shingle Siding | | | | | |
| 1. | Application | Size of Lot | 50′ x 100′ | 40′ x 100′ | $150.00 |
| 2 | Plans & Appl. | Size of House | 26′ x 36′ | 24′ x 36′ | 140.99 |
| 3 | Plans | Girder supporting 1st floor | 8″ Steel I-Beam | 3–2″ x 8″ wood | 41.21 |
| 4 | Plans | Basement windows | 6 | 2 | 43.88 |
| 5 | Application | Heating System | Hot water | Hot Air | 198.61 |
| 6 | Plans | Fireplace | Yes | None | 392.02 |
| 7 | Application | Insulation, Mineral Wool | Between rafters | None | 77.59 |
| | | | | | $1044.30 |

38

Dealing generally with the evidence in support of the estimated monetary deficiencies of each item in each case, it was not very clear and convincing as to the respective items or the aggregate amount. In the case of 5123 Byer Street, the total amount claimed for deficiencies is $879.97. As to 5118 Byer Street, it is $1044.30. I am satisfied from the evidence that nothing like this large aggregate amount should be allowed for deficiencies in either case. What is asked for is specific performance to make the buildings comply with the plans and specifications, or in lieu thereof, a monetary allowance. The ceiling price was of course determined by the Federal Housing Administration office in March 1946, nearly five years ago. The Government produced no witnesses to state just how the approved ceiling price was computed in detail. The witness Whitaker who was called for that purpose could only give general evidence from his information as to the general basis for computation of prices by the agency based on a comparison of prices in 1940 with those of 1946 or 1947, the latter showing, as he said, about a 57% average net increase for building materials generally, but without analysis or itemization of varying statistical ratio increases for particular items such as lumber, steel, plumbing, bricks and labor. The memorandum above set out is based on Mr. Whitaker's testimony alone. I am not satisfied from the evidence that it fairly or even approximately correctly represents the reasonable difference in value between the houses as per plans and specifications and the houses as actually constructed. It may be noted, although possibly it is legally immaterial, that the purchaser of each house bought it after personal inspection and without knowledge of or reliance upon plans or specifications, of which indeed they apparently had no knowledge.

In addition to the unsatisfactory and unconvincing evidence of the correctness of the Government's claim for monetary allowance for deficiencies, I find other objections to various items thereof. For instance, it is claimed the represented size of the house on the plans and the application were for houses of 26 x 36, when the houses were actually 24 x 36. The plans did show 26 x 36 but the figure in the application made by the defendant showed the correct floor area. Another item is defective or insufficient parging (waterproofing) of basement walls. There is conflicting testimony on this and I disallow it on the evidence. There is an item of substitution of wooden joists or girders for steel I-Beams (allowance $41.21), which is reasonable. The defendant was unable to obtain the steel. The substitution of wooden joists was approved by the Building Inspector of Prince George's County who on inspection found the buildings entirely in accordance with the local code. The heating system in the application appears to have been specified as hot water when hot air was substituted by the defendant because radiators and other equipment for hot water was not obtainable. But the specification of hot water does not appear in the plans filed by the defendant and in the application it was filled in by the secretary mentioned, and apparently without the defendant's knowledge. The plans showed a fire place but the houses did not contain a fireplace although they did contain a chimney. The defendant was unable to obtain sufficient bricks for a fireplace in addition to the chimney. The defendant's testimony was that if the additional bricks could have been obtained the extra cost would have been about $175, which latter item I allow. In the house 5118 Byer Street there is an alleged monetary deficiency of $150 for the size of the lot which the Government claims should have been 50 x 100, when it was in fact only 40 x 100. But again the size of the lot does not appear on the plans filed by the defendant and the notation in the application was not made by the defendant. The Federal Housing Administration made no inspection of the houses while under construction and none thereafter until more than a year after they had been completely built.

■ Without further considering details I conclude that a monetary allowance of $300 per house for the deficiencies is reasonable and sufficient. As a practical

matter I doubt very much indeed that the variations stressed by the Government affected the market price or the real value of the houses for practical sale purposes. There was no actual imposition upon the purchasers each of whom bought after inspection without reference to plans and specifications. The defendant was acting entirely in good faith throughout as I find from the evidence. In each sale the purchase price was that determined by the appraisal of the Veterans Administration. There is no evidence of fraud or deceit of any kind on the part of the defendant.

Coming now to the law of the case, it is to be noted that the Government bases its right of recovery on both the Second War Powers Act, 50 U.S.C.A.Appendix, § 631 et seq., and Priorities Regulation 33 issued thereunder, and also on sections 4 and 7 of the Veterans' Emergency Housing Act of 1946, 60 Stat. 207, 210, 211, 50 U.S.C.A.Appendix, § 1821 et seq. Counsel for the defendant contends that the recovery claimed by the Government in this case, restitution to the purchasers, was not authorized by either Act and particularly not by the Second War Powers Act. The theory of the Government is that the defendant is liable because his application and the priority orders granted him thereunder constituted a contract with the Government in which he expressly agreed not to sell the houses at prices in excess of the ceiling prices named in the priorities order given him; and also agreed to build the houses in accordance with the plans and specifications. It is clear enough on prior authority that if the case is governed by the Housing Act of 1946 the Government would be entitled, as a matter of procedure at least, to the re-

lief requested. Section 7(a) of the Housing Act, Public Law 388, 79th Cong., contained wording parallel in scope and language to section 205(a) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix, § 925(a).[1] In Porter v. Warner Holding Co. 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332, a case involving restitution of excessive rents under the Emergency Price Control Act, it was held that an order for restitution was authorized as an equitable adjunct to an injunction decree or as an order appropriate and necessary to enforce compliance with the Act.[2] And the same principle has been applied in suits involving the Housing and Second War Powers Acts. Keele v. United States, 5 Cir., 178 F.2d 766; United States v. Carter, 5 Cir., 171 F.2d 530; Heinicke v. Parr, 6 Cir., 168 F.2d 194. The one year period of limitations for suits by individual purchasers of houses in section 7(d) of the Veterans Emergency Housing Act is not applicable to a suit for enforcement brought by the United States under section 7(a). See Blood v. Fleming, 10 Cir., 161 F.2d 292; Creedon v. Randolph, 5 Cir., 165 F.2d 918. And as the suit is brought by the Government to enforce compliance with a public law in which there is a public interest it is not necessary to join the individual purchasers as parties plaintiff in the case.

Title 3 of the Second War Powers Act, 50 U.S.C.A. Appendix, § 633, deals with the subject of priorities orders (in the event of scarce materials in emergencies) and gives jurisdiction to the district courts, subsection (a)(6),—

" * * * to enforce any liability or duty created by, or to enjoin any violation of, this subsection (a) or any rule, regula-

---

1. Section 7(a) of the Housing Act read: "Whenever in the judgment of the Expediter any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 5 of this Act, he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Expediter that such person has engaged or is about to

engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order, may be granted and if granted shall be granted without bond." (Italics supplied.)

2. See also to the same effect Creedon v. Randolph, 5 Cir., 165 F.2d 918; Woods v. McCord, 9 Cir., 175 F.2d 919. And restitution may be ordered even though an injunction is not required. Bowles v. Skaggs, 6 Cir., 151 F.2d 817.

tion, order, or subpoena thereunder whether heretofore or hereafter issued."

Under this Act Priorities Regulation 33 effective January 15, 1946 as amended, was issued with respect to the "reconversion housing program". It was published in Volume XI, No. 10 of the Federal Register of January 15, 1946, pp. 601 et seq. Subsection (e) (p. 602) provides:

"(e) * * * A builder who uses the HH rating to get materials for housing accommodations must construct them in accordance with the description given in the application except where he has obtained from the Federal Housing Administration approval for a change from the application."

Subsection (g) (p. 602) provides:

"(g) * * * The restrictions on sales prices and rents contained in this paragraph (g) must be observed so long as this regulation remains in effect. They apply to dwellings of the kinds described below when built or converted under the Reconversion Housing Program (where the builder has used the HH rating to get materials for the construction or conversion). * * *."

Subsection (g) (2) (ii) provides:

"A builder must not sell a one-family dwelling built or converted under the Reconversion Housing Program, including the land and all improvements (including garage if provided), for more than the maximum sales price specified in the application, including within this sales price the amount of any brokerage fees or commissions paid in connection with the sale, whether paid by the builder or by the purchaser."

Subsection (L) (p. 604) provides:

"(L) * * * A builder may apply to the appropriate State or District Office of the Federal Housing Administration for an amendment to his approved application. If the amendment covers changes in the specifications of the proposed dwelling or dwellings or changes in the proposed sales price or rent (see paragraph (g) (6), the request for an amendment may be made by letter in triplicate. If the request for an amendment is granted, the provisions of this regulation apply to the application as amended."

And subsection (m) provides:

"(m) * * * All communications concerning this regulation should be addressed to the CPA, Washington 25, D. C., Ref: PR–33, except that inquiries as to specific applications should be addressed to the appropriate State or District Office of the Federal Housing Administration."

Subsection (n) provides penalties for violations.

It is to be noted that the Second War Powers Act does not contain phraseology or scope of provisions parallel to that in the Emergency Price Control Act which was relied on in Warner Holding Company case, supra, as authority for allowing orders for restitution to purchasers; nor does it or the regulation referred to therein expressly authorize suits by veteran or other purchasers; nor does it, as did the subsequent Veterans Emergency Housing Act, impose a limitation on the time within which such suits may be brought by purchasers. It is therefore contended by the defendant that the remedy requested by the Government in this case is not authorized under this Act and Regulation. As an original proposition it was at least debatable whether it was the intention of Congress in this Act and the Regulation thereunder, to authorize such relief. But I find that this precise question has been considered and determined by two appellate courts in the 5th and 6th Circuits, in at least three cases. Counsel for the Government also cites a number of unreported district court decisions, the texts of which are not presently available. As I have been referred to no decisions to the contrary in this or other Circuits, or in the Supreme Court, I feel that the question must be foreclosed at the present time by the appellate decisions referred to. Thus in Keele v. Holt, 171 F.2d 480, it was held by the 5th Circuit (opinion by Circuit Judge Hutcheson) that under the Second War Powers Act (not the later Housing Act) individual purchasers were entitled to sue for restitution or for dam-

ages for violation of the agreement made by the builder in his application and the priorities order granted despite the fact that the Act and Regulations did not expressly grant that right, and as the violation occurred before the passage of the Veterans Emergency Housing Act, the one year limitation therein was not applicable. And in Keele v. United States, 178 F.2d 766, the same Circuit held (opinion by Circuit Judge Russell) that restitution could be ordered under the same Act at the suit of the Government. Heinicke v. Parr, 6 Cir., 168 F.2d 194, was to the same effect as Keele v. Holt, supra.

■■ The Housing Act of 1946 covered much the same ground that was included in Priorities Regulation 33 under the Second War Powers Act, and must be construed as in pari materia, with it. The Housing Expediter under the Housing Act authorized the CPA under the Second War Powers Act to continue to act under the regulations of both Acts. In practical effect the administration of Priorities orders and Regulations under the Second War Powers Act was merged in and continued under the administration of the Veterans Emergency Housing Act. I conclude, therefore, that the position of the Government is correct that it is entitled to rely on the applicable provisions of both the Second War Powers Act and the Housing Act in this case.

Nevertheless counsel for the defendant vigorously contends that as the suit is one of an equitable nature no relief should be granted under the facts of the particular case. It is pointed out (1) that throughout the defendant acted in good faith without fraud or deceit of any kind; (2) that the purchasers bought on the basis of their own inspection of the completed houses without knowledge of or reliance on the plans and specifications; (3) that sale prices were in accordance with appraisals made by the Veterans Administration under another Act of Congress relating to guaranteed loans to veterans; (4) that the defendant was inexperienced both in building operations and the applicable administrative procedure; (5) that no inspection was made by the FHA until more than a year after the houses had been completed and sold and that suit was not instituted by the Government until long after the Housing Program had been discontinued. It is argued that under these facts restitution to the purchasers would constitute "unjust enrichment".

■■ Despite what force there may be in these considerations from the standpoint of general fairness, I am unable to give effect to the argument in view of the public interests that are involved. While courts of equity have power generally to mold the forms of relief to the exigencies of particular cases, the denial of any relief in this case should properly be based only on general equitable principles which would constitute established equitable defenses, or, in other words, the extent of discretion is limited to a "judicial discretion". It is clear enough, despite the possible personal hardship to the defendant in the particular case, he made an agreement with the Government for an adequate consideration, as expressed in formal legislation to observe the binding provisions of his application and the priorities order granted. It is also clear enough that he exceeded the maximum sales prices in selling two of the nine houses and that he did not exactly and fully comply with all the requirements in the plans and specifications with respect to all of the nine houses. While the purchasers may be adventitiously benefited by the restitution order it can hardly be legally said that they will be "unjustly" enriched because the nature of the contract between the defendant and the Government was for their benefit and the Government has a public interest in enforcing the requirement. In view of the lapse of time that has occurred in this case and the particular circumstances, it may possibly be thought that as a matter of policy the Government might have forborne to bring the particular suit, just as it omitted from the suit one of the houses sold above the ceiling price and not in complete accord with the plans and specifications, where the original purchaser had re-sold it at a profit. But however that may be, the court cannot properly sub-

stitute its judgment as to policy for a legally authorized administrative determination.

■ Counsel for the Government characterizes the defendant's statement, that an unidentified representative of the Federal Housing Administration told him to go ahead and build the houses as best he could and that the sale prices would be fixed by an appraisal of the Veterans Administration, as "fantastic". Probably the more correct view of this alleged occurrence is that the defendant, an inexperienced man, simply misunderstood his informant. But however that may be, I do not think that it can constitute a legal or valid equitable excuse for the defendant's failure to perform his contractual engagement. He was bound by the provisions of Priorities Regulation 33 which, among other things, contained the provision that any desired amendments of the application must be presented in writing to the Federal Housing Administration. It is true that the Regulation, in that respect apparently unlike the later Regulation under the Housing Act, did not expressly provide for authorized changes to be approved in writing by the Federal Housing Administration; but the whole tenor of the Regulation seems to imply it. Clearly the alleged representative was not authorized to bind the United States in such a way as to constitute a waiver of the provisions of the contractual obligation by such an informal verbal statement. Nor does the delay of the Federal Housing Administration in inspecting the work done under the application and order and the further delay in instituting the suit constitute laches sufficient in legal or equitable effect to bar the relief sought in the complaint.

■ I conclude, therefore, that the Government is entitled to an order for restitution to the two purchasers who bought at a sum in excess of the ceiling price, and also to the purchasers of all nine houses to the extent of what I find to be the fair value of the construction deficiencies, subject in the latter cases, however, to deduction of the difference between the ceiling price and the lesser actual price which occurred in the case of four of the houses.

Counsel should submit the appropriate form of judgment promptly in due course.