**UNITED STATES v. SAUERS.**

Civ. A. No. 1798.

United States District Court
D. Minnesota, Third Division,
Sept. 19, 1951.

Clarence U. Landrum, U. S. Atty., Clifford F. Hansen, Asst. U. S. Atty., St. Paul, Minn., for plaintiff.

John E. Daubney, of Bouthilet & Daubney, St. Paul, Minn., for defendant.

DONOVAN, District Judge.

■ By complaint filed April 3, 1950, plaintiff brings action under § 7(c) of The Veterans' Emergency Housing Act of 1946[1] against defendant, a building contractor. Relief is sought by way of mandatory injunction requiring defendant to make restitution to certain nonveteran purchasers of houses constructed by defendant, with reference to which plaintiff contends there were "omissions" and "substitutions" amounting to a departure from the "specifications contained in the application as approved by the Federal Housing Administration" governing the maximum sale prices.[2] The amounts involved range from $77 to $276. It is conceded that the individual purchasers who would benefit by recovery are barred by the applicable statute of limitation. Plaintiff contends, however, that said limitation does not apply to it. The court finds for plaintiff in respect to the statute of limitations.

The houses in question were built in 1946. The plans and specifications are of a rather makeshift character. To illustrate, in Exhibit 3, page 4, is specified "range space and refrigerator space * * *. [and] built-in kitchen table", which does not mean what it says at all.[3] Custom and practice and

1. 60 Stat. 207, 50 U.S.C.A.Appendix, § 1821 et seq.

2. Priorities Regulation 33, 11 F.R. 601, 4085, issued pursuant to provisions of Title III of the Second War Powers Act, as amended, 56 Stat. 176, 50 U.S.C.A. Appendix, § 631 et seq., and Executive Orders thereunder, pleaded in paragraph 3 of said complaint.

3. Harold W. Fridlund, who was an architect in charge of such matters for the Housing Administration, testified as follows:

"Q. Mr. Fridlund, referring to the blueprint and plaintiff's exhibit No. 3 I will show you the portion marked page 4. Referring particularly to the kitchen where it says 'range space and refrigerator space' would that indicate to you that there should be a range and refrigerator in that location? A. No.

"Q. Referring now to the dotted line marked 'built-in kitchen table' would that necessarily indicate to you that as a part of these plans and specifications a kitchen table should be in that location and furnished by the contractor? A. No, not necessarily.

the judgment of the contractor would then be relied upon to some extent. The principal witness for plaintiff emphasizes that the so-called plans and specifications were in effect nothing more than a check list used in connection with the application signed by defendant. In some instances the articles and materials checked were unob-

\* \* \* \* \* \*

"Q. Incidentally, these specifications are merely a check list, are they not, on a form furnished by the Federal Housing? A. That is right.

"Q. And you wouldn't as an architect actually call them specifications, would you, Mr. Fridlund? A. No, sir.

"Q. As a matter of fact it is merely a sketchy check list, is it not? A. This was a form prepared not by Federal Housing I don't believe but by the Civilian Production—so-called Civilian Production Administration at that time and certainly it is only set up it seems to me, only as a guide to indicate the general scope of the construction.

\* \* \* \* \* \*

"Q. And these specifications, if we can call them such, are sketchy at the best, are they not?. A. I would say that is obvious by looking at them.

"Q. And that is from your experience as an architect, is it not, sir? A. That is right.

\* \* \* \* \* \*

"Q. Did your office make a practice of sending out amendments to government regulations to contractors who are operating under them? A. We did in connection with the FHA business in general but on these items which we were doing for the CPA I wouldn't say that our office did do that. I don't think they did.

"Q. And now referring to the method of making changes at the time these houses were built in 1946, first let us say, for example, that a contractor wished to change a door with a small window in it to a plain type door. Was it the practice of your office to require that contractor to come over there and get a written authorization to make that change? A. No, I wouldn't say so: I mean I think we would take the attitude that very minor changes like that were understandable, I am afraid.

"Q. And how about changing over from electricity to gas as far as a range is concerned? Would it be a practice or was it a practice at that time to require a written authorization? A. No. I don't believe it was.

\* \* \* \* \* \*

"I would say that generally the practice of the office was not to either expect or require a builder to submit each and every so-called minor change to the office for approval. I think the office was op-erating under the intent of this thing pretty much and naturally if a builder had made application to build we will say a three-bedroom rambler house and then decided to change it to a story and a half Colonial, obviously something like that would require a change. On the other hand, if a door sling was to be changed or if a kitchen cabinet of one type was going to be substituted for another I think we felt that we had the right to presume that there would be a certain amount of give and take on these items and we wouldn't expect these changes to be made. Now in reference to this question of rain leaders—

"Q. Excuse me. With reference specifically to rain leaders isn't it true that in 1946 and 1947 it was extremely hard to obtain soil pipe? A. Well, I was going to say that the City of St. Paul Code required—did at that time previous to that, require that rain leaders be connected to the city storm sewer system and then the shortages of cast iron pipe became so critical that the local building inspectors office did not require adherence to it because it was just impossible to get. I would say that we normally wouldn't probably have required a written authorization to change that although it is getting up to the amount of an item that could be a factor, $75.

\* \* \* \* \* \*

"The Court: \* \* \* Are the houses constructed pursuant to the plans and specifications? The Witness: No, I don't suppose they are exactly built according to plans and specifications.

"The Court: To the detriment of whom, would you say, as an architect? The Witness: The statements that have been made are true as to what was put in there. I personally don't see much detriment to anybody on either side of this thing.

\* \* \* \* \* \*

"Q. (By Mr. Daubney): Mr. Fridlund, if you assume that this is a sample or model drawing and was submitted to the Federal Housing Administration on that basis, isn't it true that it is a general practice among contractors to make individual changes in each house, that is so each house won't look like peas in a pod, they will take a dormer off here and change a door and use different types of doors. A. That is correct.

"Q. And hasn't that been the practice

tainable on the market, and substitutes of greater value were used in lieu thereof.

The houses here involved were sold in 1946 and 1947[4], prior to the repeal of the Veterans' Emergency Housing Act of 1946, supra, by the terms of the Housing and Rent Act of 1947[5]. Said repeal became effective on June 30, 1947.

Defendant admits certain omissions and substitutions, but contends the changes or alterations arising thereoutof improved the construction and increased the value of the completed house in each case. There is much to be said in support of defendant's contention. This would appear from the quoted testimony, supra.

Plaintiff's evidence in support of its claim for monetary allowance and restitution for the claimed deficiencies is neither satisfactory nor persuasive.

It is obvious from the record of this case that a balancing of equities can result only in judgment for the defendant. The plaintiff has failed to show that the defendant, in building the houses, has not substantially complied with the contracts, taking into account all of their ambiguous provisions.

The position of the government, according to the testimony of plaintiff's architect, is apparently based on a supposition that the houses may not have been "exactly built according to plans and specifications." But this witness further testified, in speaking of substitutions, "I personally don't see much detriment to anybody on either side of this thing."

Plaintiff permitted three years to elapse after the sale of the houses before instituting this proceeding. The relief sought is governed by the applicable Housing Act, a war measure requiring prompt enforcement. Plaintiff is guilty of laches and has failed to exercise sound discretion. I am of the opinion that the claim for restitution should be denied.

Defendant may submit findings of fact, conclusions of law and order for judgment, together with form of judgment consistent with the foregoing, and without costs or disbursements.

An exception is allowed plaintiff.

and wasn't that the practice in 1946? A. That is right."

4. Plaintiff's beneficiaries purchased in the following order:
Lawrence J. Polubinsky November 7, 1946;
John B. Stepan     November 16, 1946;

Arthur Wiegand     December 8, 1946;
Raymond P. McFadden March 3, 1947;
James T. Masterson  March 25, 1947;
Robert M. Wallin    April 2, 1947.

5. 61 Stat. 193, 50 U.S.C.A.Appendix, § 1881 et seq.