[Civ. No. 15541.   First Dist., Div. One.   June 29, 1954.]

ALBERT SHELL et al., Respondents, v. MAX SCHMIDT, Appellant.

James W. Harvey, Walter K. Olds and Dorothy E. Handy for Appellant.

Ropers & Majeski for Respondents.

PETERS, P. J.—Twelve sets of plaintiffs, each set consisting of a husband and wife, brought these actions against Max Schmidt and others for fraud, and for breach of contract. The other named defendants were granted a nonsuit, the propriety of which is not involved on this appeal. The husband plaintiffs, all veterans, and their wives, had purchased homes from Schmidt, constructed by him in San Mateo County. The first 12 counts of the complaint, which are identical except for the names of the plaintiffs, all charge Schmidt with fraud as to each sale transaction. The 13th count, in which all plaintiffs join, charges the breach of a contract between Schmidt and the United States, it being averred that plaintiffs, as veterans, were third party beneficiaries of that contract. The fraud counts and the contract count are based on the same facts, and allege but one cause of action. The fraud alleged, so far as pertinent here, is that Schmidt in applying for priority permits from the Federal Housing Authority represented to and promised* that agency that he would build the houses in conformity with certain designated plans and specifications; that Schmidt failed to comply with the submitted plans and specifications in certain specified respects; that this caused damage to each set of plaintiffs, in certain particulars, in the total amount of $4,800. The breach of contract count alleges that Schmidt

---

*The fraud counts also allege that such representation was made to plaintiffs, but except as to three sets of plaintiffs, there was a complete failure to prove this allegation. This will be discussed later in this opinion.

contracted and agreed with the F.H.A. to build the houses in conformity with the plans and specifications submitted by him in applying for the priority permits; that plaintiffs, as veterans, are third party beneficiaries of that contract; that Schmidt violated the contract by not building in conformity with the plans and specifications in exactly the same respects alleged in the fraud counts; that plaintiffs were damaged in precisely the same respects and amounts as set forth in those counts. This count, in which all 12 sets of plaintiffs join, alleges a total damage of $57,600, or $4,800 to each set of plaintiffs. Thus, each set of plaintiffs pleaded but one basic cause of action for $4,800 damages, but alleged alternative theories of recovery—fraud and breach of contract. The jury brought in verdicts for $1,250 for each set of plaintiffs on the 12 fraud counts, and awarded all of the plaintiffs $12,000 collectively on the contract count. Thus, in legal effect, each set of plaintiffs was awarded a total of $2,250. From the judgments on these verdicts Schmidt appeals.

The facts are not substantially in dispute. On April 30, 1946, Schmidt applied to the F.H.A. under Priority Regulation 33 for priorities on building materials to construct 48 dwellings for veterans. Regulation 33 had been originally issued by the Civilian Production Administration pursuant to authority granted by the Second War Powers Act of 1942, as amended (50 U.S.C.A. (App.) §§ 631-645b). Later the Veterans' Emergency Housing Act of 1946 (50 U.S.C.A. (App.) 1821) empowered the Housing Expediter to delegate to the Civilian Production Administration certain powers conferred upon him by certain sections of the Veterans' Emergency Housing Act of 1946. This power was exercised, and Regulation 33 was continued in effect under authority of both statutes, and was admittedly in effect at all times here pertinent.

This regulation prescribes in detail the method by which a contractor desirous of building homes for veterans and who needs material priorities, shall make application to the Civilian Production Administration (the F.H.A.). Among other things, the regulation, as amended, expressly provides that a builder constructing houses under it must perform the work pursuant to the description, that is, pursuant to the plans and specifications required to be submitted by the builder to the F.H.A., before he can secure the desired priorities. Another section of the regulation provides that all houses

completed after the effective date of the regulation are subject to a maximum sales price established by the F.H.A.

When Schmidt applied for his permit he was required to and did submit plans and specifications of the proposed houses he desired to build. These specifications, among other things, represented that each house was to have exterior wall sheathing of wood, two 30,000 B.T.U. gas floor furnaces, and interior wall surfacing of gypsum lath and plaster. Pursuant to this application priorities were granted, and a maximum sales price of $9,700 per unit (later on Schmidt's petition increased to $12,000) was fixed by the F.H.A.

Between May 15, 1947, and November 13, 1947, the respondents purchased from appellant, or from his agents, for $12,000 each, 12 of the 48 houses then in various stages of construction. All of the 12 houses purchased by respondents were built by appellant without compliance with and in violation of the plans and specifications submitted by him to the F.H.A. None of the 12 had an exterior sheathing of wood. The exterior walls, in fact, were made of construction paper covered with chicken wire and over this cement stucco was applied. Wood exterior wall sheathing protects a stucco house from wind and moisture, a protection not afforded by the paper type of construction used by appellant. Only one floor furnace, apparently of 30,000 B.T.U. capacity, was installed in each house, instead of the two called for by the specifications. Also in violation of the specifications, which called for interior walls of gypsum lath and plaster, sheet rock was used.

The complaint was filed February 11, 1949. In the first 12 causes of action, based on fraud, it is averred that on November 9, 1948, the plaintiffs first discovered the falsity of the representations made by appellant.

The evidence of the respondents as to the claimed misrepresentations can be summarized as follows: None of the respondents saw the plans and specifications prior to the time they purchased their homes, nor did they know what they contained. The Shells (first count) testified that they understood that the home was inspected and approved by the Veterans Administration. The Johnstons (second count) testified that they relied entirely on the government and its inspection service to see that they got a good buy, and that the selling agent represented to them that the house they ultimately purchased was to be similar to the one across the street. That

house had exterior wall wood sheathing which could then be seen. This led them to believe that their house was to be similarly constructed. Substantially similar testimony was given by the Douglases (fourth count). The Brichtas (third count) testified that they never saw the plans or specifications. Teeter (fifth count) testified that although he did not see the plans and specifications he knew that they existed, and he was told that the houses were government inspected. There is no evidence of the claimed representations made to the Hexbergs (sixth count) in the record. The Thunens (seventh count) were told by the selling agent that these homes were G.I. supervised by a G.I. appraiser. The Kottas (eighth count) testified that they relied upon the representation that the homes were government inspected. The Mitchells (ninth count) testified that although they were not told that their house was government inspected, they "figured" it was. They were told that the house was being built under G.I. specifications, and it was specifically represented to them that their house was to have wood sheathing. This is the only plaintiff who directly so testified. The Rodriguezes (tenth count) and the Coccarys (twelfth count) testified that they asked to see the plans and specifications, but did not receive them. Rodriguez testified that he was told not to worry about the plans and specifications because all of the houses were being built according to specifications, and that the houses would be inspected and passed on by the government before he would be allowed to buy. Coccary was told that the plans and specifications were not available at the moment. The Schneiders (eleventh count) testified that they relied upon their house being a veteran's building for their protection.

All of the respondents who testified admitted that they had seen and inspected the houses before they purchased, and that they knew that their house contained but one gas furnace. None was aware of, asked any questions about, or paid any particular attention to the material used on the interior walls. All testified that their homes were not only underheated, but that, because of the inadequate exterior walls, they became damp and cold, and that mold and mildew grew on the back room walls. The evidence is ample and substantial to the effect that largely because of the inadequate exterior walls, and partly because of the inadequate heating equipment, the plaintiffs were made quite uncomfortable, and did not receive a house of the quality and type called for by the plans and specifications.

Testimony was given by an investigator from the office of the Housing Expediter that after the houses were purchased he visited the tract and discovered the variances from the specifications. He testified that, because of these violations, prosecution of appellant by the government was contemplated, but that the case was placed on the inactive list when it was learned that the homeowners would bring suit against him.

Appellant does not challenge the implied findings to the effect that he failed to construct the houses in accordance with the plans and specifications filed with the F.H.A., his basic contentions being that his exclusive liabilities for such violations and the exclusive remedies of the purchasers for such violations are controlled by the pertinent provisions of the Veterans' Emergency Housing Act of 1946, and that such statute does not confer on purchasers any right to maintain a cause of action for fraud or for breach of contract when such causes of action are predicated on failure to comply with the plans and specifications submitted to the F.H.A. Respondents, while conceding that the federal statute does not authorize fraud or breach of contract actions for such violations, maintain that the federal statute merely created additional statutory remedies and in no way affected the existing common law remedies for fraud or breach of contract. Respondents' theory is that they are suing on common law causes of action not grounded on the Veterans' Emergency Housing Act, and that the federal statute is only relevant as setting up a standard against which to measure the acts of the appellant in failing to perform according to the plans and specifications required by that statute.

We agree with respondents that the federal statute should not be interpreted as containing the exclusive remedies of purchasers so as to deprive them of their common law remedies. To do so would be to deprive veterans of most important rights, and after one year from the date of purchase (the statute of limitations provided in the statute for the statutory remedies of purchasers) to confer immunity on contractors in their relations with purchasers. This would be in subversion of the very purpose and intent of the statute.

Section 5 of the Veterans' Emergency Housing Act of 1946 provides that it shall be unlawful to sell a house in excess of the maximum sales price fixed by the F.H.A., and also that it shall be unlawful for the contractor to violate the terms of any regulation or order issued under the provisions of the statute. It is thus made unlawful to violate any of the con-

ditions imposed by Regulation 33. Section 7(a) of the act confers upon the government power to prosecute violators, and to obtain monetary compensation for purchasers from contractors on account of deficiencies in construction resulting from the contractor's failing to comply with the specifications filed by him. By section 7(d) the individual purchaser is granted the statutory right to sue the contractor for violation of the maximum selling price fixed by the F.H.A., and such action must be brought within one year from the date of the violation.

Based on these provisions it is appellant's argument that the purchaser has but one action—the right to seek recourse for an overcharge—which action must be brought within one year, and that the purchaser has no legal right to sue the contractor for fraud or breach of contract where such fraud or breach is predicated upon failure to comply with the specifications submitted.

There seems to be no case directly holding that, under the Veterans' Emergency Housing Act of 1946, the purchaser has remedies not therein conferred, but there are cases deciding a similar point under similar statutes. *Heinicke* v. *Parr*, 168 F.2d 194, and *Keele* v. *Holt*, 171 F.2d 480, held that, although, under the Second War Powers Act of 1942, neither that statute nor regulation 33 provided for actions for restitution or for an overcharge, such actions would lie under general equitable or common-law principles. In other words, such remedies existed in addition to those granted by statute. In *United States* v. *Austin*, 100 F.Supp. 33, it was recognized that the government could seek restitution even though the Second War Powers Act of 1942 did not provide for this remedy. In *Adams* v. *Albany*, 80 F.Supp. 876, it was indicated, by way of dicta, that common law remedies existed under the Veterans' Emergency Housing Act of 1946.

The theory of the cases holding that purchasers were not deprived of their common-law remedies by the Second War Powers Act of 1942, and that both the purchasers and the government had remedies not therein enumerated, was that the statute was passed for the benefit of veterans, and should be interpreted so as to help and to assist rather than to penalize them. Such reasoning is equally applicable to the Veterans' Emergency Housing Act of 1946. Not only does the very name of the statute disclose its purpose of aiding veterans, but such purpose has frequently been noted by the courts. In *Adams* v. *Albany*, 80 F.Supp. 876, 879, the court

expressed this purpose in the following language: "We start with the fact that the statute under discussion was passed for the benefit of veterans of World War II. It was an act of munificence on the part of a grateful Government toward those who served in World War II, which expressed itself in the form of assistance in the purchase of housing accommodations." (See comment U.S. Code Congressional Service, 79th Cong., 2nd Sess. 1946, p. 1177.)

This fundamental purpose would, in many cases, be defeated if the statute were interpreted so as to deprive the veterans of their normal remedies to the benefit of defaulting contractors—the very class it was the purpose of the statute to protect the veterans against. ■ It must be held, therefore, that the enumeration of remedies in the statute merely created new enumerated remedies and was not intended to and did not deprive the veterans of any action for fraud or breach of contract that they might have under general common law principles.

But, says appellant, if veterans do have an action for damages caused by the failure of the contractor to follow the plans and specifications, whether in fraud or contract, such action must be brought within one year of the date of the violation as provided in the federal statute, on the theory that, when a statute creates a right, the expiration of the period set forth in the statute for the bringing of the action extinguishes such right. But that is not this case. The one-year statute applies only to the statutory right created by the statute—the right to bring an action for an overcharge. But, the Veterans' Emergency Housing Act of 1946 did not "create" the causes of action for fraud and breach of contract. Respondents here are relying on common law causes of action that do not find their origin in that statute. The statute merely establishes the standard by which appellant's conduct is to be measured. It did not create the right to sue. ■ Therefore, the statute of limitations applicable to the remedy created by the statute, has no application to the nonstatutory remedies. The actions were brought well within the periods applicable to the common law remedies here involved.

■ Appellant next contends that there was no evidence of fraud, and that the implied findings on that issue are unsupported by any substantial evidence. With that contention, as to nine sets of respondents, we must agree. The Hexbergs did not testify at the trial. There was no evidence

at all of any fraudulent or other representations made to them. The other respondents admitted that they did not see the plans and specifications prior to the times of their respective purchases, and admitted that they did not know what they contained. They can hardly claim that they were induced to purchase in reliance upon any representations contained in the plans and specifications. Moreover, all respondents who testified, admitted that they had inspected the houses prior to purchase, and knew that they contained but one floor furnace. Such inspection also would have disclosed that the interior walls were not gypsum lath and plaster, but were constructed of sheet rock. Such evidence will not support a finding of reliance or inducement upon which to predicate a fraud action. By their own testimony these respondents have negatived any inducement to purchase based on the provisions of the plans and specifications.

Respondents argue, in support of the fraud verdicts, that appellant was under a duty of disclosure, and that his nondisclosure constitues fraud. ■ There is, in general, a duty to disclose concealed defects known to the seller. (*Herzog* v. *Capital Co.*, 27 Cal.2d 349 [164 P.2d 8].) Obviously, although the interior wall finish and the number of furnaces were matters that a reasonable inspection would disclose, the sheathing under the exterior wall finish would not be disclosed by a reasonable inspection. But the type of sheathing used was not, in the absence of misrepresentation, a defect of the type referred to in the nondisclosure rule. Houses can be and are built with the type of construction here used. If the purchasers are not misled, such construction would not constitute a concealed defect. To find that the exterior wall construction is a defect, reliance must be had on the plans and specifications, and none of the respondents knew what they contained.

This reasoning does not apply to three sets of respondents. Mrs. Mitchell (ninth count) testified that it was represented to her by the selling agent that the entire house, with the exception of the garage, was covered with wood sheathing. This was a direct misrepresentation of fact and sustains the finding of fraud as to this set of respondents. Mr. Johnston (second count) when he asked the selling agent if the rest of the house subsequently purchased by him was covered with paper like the garage, was told: "No, it is like the rest of those houses being built across the street." Visual inspection disclosed that the houses referred to had wood sheath-

ing on the exterior walls. Somewhat similar testimony was given by Mrs. Douglas (fourth count). Thus, positive misrepresentations sufficient to sustain the findings of fraud were made to these parties.

▮ Respondents argue that the evidence is sufficient to indicate an intent to defraud a class, namely, veterans, and that in such a situation false representations made to any member of the class, can be relied upon by all other members of the class. In this connection section 1711 of the Civil Code is relied upon. It provides: "One who practices a deceit with intent to defraud the public, or a particular class of persons, is deemed to have intended to defraud every individual in that class, who is actually misled by the deceit." That section would have been applicable had the representations made to Mitchell, Johnston and Douglas been published by Schmidt to veterans generally. (*Wennerholm* v. *Stanford Univ. Sch. of Med.*, 20 Cal.2d 713 [128 P.2d 522, 141 A.L.R. 1358].) But here there was no such public broadcast of the misrepresentations. The misrepresentations were made to particular individuals. In the instant case, although it was proper to join the 12 fraud counts in one complaint, each couple must recover, if at all on the fraud issue, because of reliance upon misrepresentations made to that couple, and cannot recover upon misrepresentations made to others, and not publicly made. (*Goodspeed* v. *Great Western P. Co.*, 19 Cal.App.2d 435 [65 P.2d 1342].)

But these arguments do not apply to the cause of action for breach of a contract made for the benefit of a third party. This is the 13th count of the complaint. That count is based on two premises. First, that the application for a permit and its granting subject to conditions resulted in a contract between appellant and the United States to the effect that appellant contracted and agreed to build the houses in conformity with the plans and specifications in exchange for a permit to secure priority for building materials then otherwise unobtainable. The second premise is that respondents, as veterans, who purchased the homes so built, were third party beneficiaries of this contract. Both premises are sound.

▮ That the relationship between the government and appellant can properly be described as contractual is clear. Under the statute the contractor, in order to secure priorities for building materials, had to file a request therefor. This request could be granted only upon the contractor promising, among other things, that if priorities were granted, he would

build in accordance with the plans and specifications. All of the elements of a lawful contract are present. All of the federal cases to which we have been referred that have found it necessary to discuss the nature of the application and its granting under the federal statutes here involved, have referred to it as creating a ''contract'' between the government and the contractor. (*United States* v. *Sauers,* 99 F.Supp. 753, 755; *United States* v. *Austin,* 100 F.Supp. 33, 41.)

Once it is established that the relationship between the contractor and the government is contractual, it follows that veterans purchasing homes, that is, the class intended to be protected by that contract, are third party beneficiaries of that contract. As already pointed out, the statute and the regulations passed thereunder resulting in the contract were passed to aid and assist veterans and for their benefit. Purchasing veterans constitute the class intended to be benefited, and the contract must therefore be for their benefit.

Under section 1559 of the Civil Code, embodying general common law principles, a third party beneficiary may maintain an action directly on such a contract. (See cases collected 12 Cal.Jur.2d 493, § 261.) The promise in such a situation is treated as having been made directly to the third party. (*J. F. Hall-Martin Co.* v. *Hughes,* 18 Cal.App. 513 [123 P. 617].) It is no objection to an action by the third party that the contracting party (here the government) could also sue upon the contract for the same breach. (*Malone* v. *Crescent City M. & T. Co.,* 77 Cal. 38 [18 P. 858].) Of course, the beneficiary must be more than incidentally benefited by the contract. An incidental beneficiary cannot successfully maintain an action. (Cases collected 12 Cal.Jur.2d 500, § 268.)

Whether the beneficiary is or is not an incidental one, or a beneficiary for whose express benefit the contract was entered into, is a question of construction. (*Woodhead Lbr. Co.* v. *E. G. Niemann Investments,* 99 Cal.App. 456 [278 P. 913].) It is not required that the third party beneficiary be specifically named as a beneficiary. All that section 1559 requires is that the contract be ''made expressly for the benefit of third parties,'' and ''expressly''. simply means ''in an express manner; in direct or unmistakable terms; explicitly; definitely; directly.'' (*Le Ballister* v. *Redwood Theatres, Inc.,* 1 Cal.App.2d 447, 448 [36 P.2d 827].)

Where the contract ·is for the benefit of a class any member or members of the intended class may enforce it. (*Garratt* v. *Baker,* 5 Cal.2d 745 [56 P.2d 225].) The fact that

the government is one of the contracting parties does not change the rule. Agreements between a state or municipality with individuals have frequently been held to be third party beneficiary contracts for the benefit of some member or groups of members of the public. (See cases collected in annotation 81 A.L.R. 1271, at p. 1299.) ▮ Thus, there would seem to be no reasonable doubt but that the jury's findings that there was a third party beneficiary contract breached by appellant to the damage of respondents are amply supported by the record.

From this analysis it follows that nine of the judgments for $1,250 each based on fraud cannot be sustained, but three of such judgments are supported by substantial evidence. The judgment in favor of all respondents for $12,000 based on breach of contract is also supported by substantial evidence. If separate causes of action were involved, such a state of facts would warrant an affirmance of the $12,000 judgment, and three of the $1,250 judgments, and a reversal of the other nine $1,250 judgments. But separate causes of action are not involved. ▮ Respondents have alleged the existence of but one primary right, and but one violation of that right. Such a complaint states but one cause of action, even though two or more theories of recovery are alleged. (*Work* v. *County Nat. Bank etc. Co.*, 4 Cal.2d 532 [51 P.2d 90].)

That but one cause of action was basically alleged is apparent. Each set of plaintiffs was seeking recovery of such amount as would place their home in the condition it would have been had compliance been had with the plans and specifications. To do this, it was alleged, would require $4,800. This sum was sought either on the theory of breach of contract or fraud, or both. But no matter how many theories of recovery were stated or proved, respondents were entitled to but one recovery which could not exceed $4,800. Double recovery could not be secured lawfully for the same identical violations of the plans and specifications. Once they have been reimbursed for their damages, regardless upon what theory such reimbursement is made, they have no lawful right to any more damages. ▮ This rule is stated as follows in 2 Freeman on Judgments (5th ed.), § 583, page 1235: "If a given state of facts entitles one to recover damages upon the theory of tort, and the same state of facts entitles him to recover upon the theory of contract, it would seem plain that recovery could not be twice had simply because the facts would support recovery upon either theory." But the

jury, pursuant to several and misleading instructions of the trial court, attempted to and did split the liability. This was error of a most serious nature.

The jury was given 26 forms of verdict, 13 in favor of respondents, 12 on the fraud counts and one on the contract count, and 13 similar forms for appellant. The jury was properly instructed on the measure of damages for fraud and the measure of damages for breach of contract, such measures, under the facts, being substantially identical. Then the court correctly told the jury that each set of plaintiffs could recover a maximum of $3,950*, "even though you should find that as to each cause of action, the cause of action for fraud and the cause of action for breach of contract, any one pair of plaintiffs has a right to recover." Then, after the jury had started its deliberations, it requested further instructions on the question of damages. The jury was then told that within the maximum limits it could allow damages on either the fraud counts or the contract count or both— in other words, that it could split the liability. The court, at this time, first repeated substantially the whole of the correct instruction partially quoted above. The foreman of the jury then indicated that further information was desired, particularly as to whether but one verdict could be brought in, or whether verdicts were required on the 13 forms submitted to it. The court thereupon described the 13 counts of the complaint, told the jury that it was limited to a maximum of $3,950 for any one set of plaintiffs, and then stated: "Now, within that limit you may do as you wish in respect to the two forms of verdict, the thirteenth cause of action considered on one side and the twelve together as another group. If it be your view that there is both breach of contract and fraud, as they were described to you in the instructions, then in my opinion you should return verdicts on all thirteen of the causes of action." After informing the jury what it should do if it found fraud and no breach of contract, and vice versa, the court repeated: "If you feel that there should be a recovery on both types of action, the one for fraud and the one for breach of contract, then you should return twelve verdicts on the first twelve causes of action for the plaintiffs and one verdict for the plaintiffs on the thirteenth cause of

---

*This figure is not in accord with the prayer of the complaint which alleges $4,800 for each set of plaintiffs as their total damage. Respondents, not having appealed, cannot complain of this error, if error it was.

action, dividing the total of your damages in such way as you wish—and I think counsel would agree that it wouldn't be particularly material how that was done. It could be a dollar on either. It wouldn't have to be mathematically precise so long as the total verdicts'' received by any set of plaintiffs did not exceed $3,950. After conferring with counsel the court repeated that if both fraud and breach of contract were found, 13 verdicts for plaintiffs should be returned, and then stated: ''but if you have fixed upon an amount as being what any one couple should recover, then that figure, whatever it is, ought to be divided between your two verdicts. . . . That would constitute . . . a finding that there is a fraud and there is a breach of contract. If you settle on a figure as being what one particular couple ought to get, then put a part of that into the verdict for them individually, and a part of it will be their one-twelfth of the lump sum verdict. But, the two together, the one-twelfth plus the individual verdict should be the amount that you think is properly recoverable by them, and the division between the two causes of action would in my opinion be immaterial, whether you have one dollar in one and the balance in the rest or whether you divided 50-50 I don't think would make any substantial difference.'' When the foreman expressed some doubt on the matter, the court stated that if the jury found for plaintiffs on both theories, it should fix a single figure as the total damages suffered by each set of plaintiffs, ''then break it down between two verdicts, the first—and it makes no difference how you allocate it, in my opinion— . . . would go into the individual verdict, one of those on the first twelve causes of action and the balance of that figure . . . include that as one-twelfth of the verdict on the thirteenth cause of action.'' Whereupon, the jury returned and shortly thereafter returned the 13 verdicts here involved.

Thus the jury was told, if it found both fraud and breach of contract, to bring in separate verdicts after arriving at the total damage and dividing that figure in any way it saw fit. This was error. It resulted in verdicts and judgments that are highly inconsistent and contradictory. If each set of respondents was damaged in the amount of $1,250 by reason of Schmidt's failure to comply with the plans and specifications, as found by the jury in its verdicts on the first 12 counts, that same set of respondents was damaged in the amount of the same $1,250 because of Schmidt's breach of his contract to build in accordance with the plans and

specifications. Yet the jury by its verdict on the 13th count has fixed this damage at an additional $12,000 for all respondents, or $1,000 for each set of respondents. This was done pursuant to erroneous instructions that it was permissible to thus split the total damages. Conceivably, the error would not have been prejudicial if both theories found by the jury were sustainable by the record. But, where, as here, nine of the separate verdicts are not sustainable, and the sustainable verdict is in a lump sum, it is obvious that this splitting of the damages was prejudicial to appellant as well as to respondents. This error, however, does not require a new trial on the issue of liability. Liability to all respondents for breach of contract, and, in addition, as to three of the respondents for fraud, has been established. Those issues need not be retried. The new trial should be limited to the issue of damages alone.

The judgments are reversed with instructions to the trial court to retry the issue of damages only, and when such damages have been ascertained, to enter judgments in favor of respondents in the amounts so fixed. Inasmuch as the basic question of liability has been determined adversely to appellant, and the issue of damages adversely to respondents, and inasmuch as the reversal is as to damages only, it is ordered that respondents and appellant each bear their own costs on these appeals.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied July 26, 1954, and appellant's petition for a hearing by the Supreme Court was denied August 26, 1954.