Jan Allen REINER, Peter Fairchild and Joseph Bilera each individually and on behalf of all others similarly situated and Jan Allen Reiner as President of West Village Houses Fair Rent Committee, Plaintiffs,

v.

WEST VILLAGE ASSOCIATES, West Ville Associates, Washington Village Housing Corp., Raqz, Inc., Starrett Brothers & Eken, Inc., Grenadier Realty Corp., Kreisel Company, Inc., Samuel R. Pierce, Jr., As Secretary of The Department of Housing and Urban Development, The City of New York and The New York City Housing Development Corporation, Defendants.

No. 81 Civ. 6632(MEL).

United States District Court,
S.D. New York.

Jan. 17, 1985.

**234**

Faust, Rabbach & Sweet, New York City, for plaintiffs; Gerald M. Kleinbaum, New York City, of counsel.

Lipkowitz & Plaut, New York City, for defendants West Village Associates, West Ville Associates, Washington Village Housing Corp., Raqz Inc., Starrett Brothers & Ekin, Inc., Grenadier Realty Corp. and Kreisel Company, Inc.; Gerald D. Roth, Louis Lauer, Stephen Sussman, Daniel Friedman; Lauer & Kessler, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendant Samuel R. Pierce, Jr., as Secretary of the De-partment of Housing and Urban Development; Alan Nisselson, Asst. U.S. Atty., New York City, of counsel.

Frederick A.O. Schwarz, Jr., Corp. Counsel of City of New York, New York City, for defendants City of New York and the New York City Housing Development Corporation; Fred Kolikoff, New York City, of counsel.

LASKER, District Judge.

This action, which controverts allegedly impermissible rent increases, involves interplay between the National Housing Act ("NHA"),[1] Article 2 of the New York State Private Housing Finance Law ("Mitchell-Lama")[2] and New York City's Administrative Code ("Merola").[3] The plaintiffs are tenants of the West Village Houses apartment project ("project")[4] and Jan Reiner as president of their representative organization, the West Village Houses Fair Rent Committee. The defendants include the past and present owners of the project and the project's managing agencies (past and present) (collectively "owner" or "landlord"), the City of New York ("City"), the New York City Housing Development Corporation ("HDC") and Samuel Pierce as Secretary of the Department of Housing and Urban Development ("HUD").

The complaint presents five claims. The plaintiffs allege (1) that HUD and the landlord violated plaintiffs' right to due process of law and HUD violated its own regulations and procedures in approving the disputed rent increase; (2) that HUD denied the tenants due process by failing to order a rollback of the rents charged in excess of those permitted under the Regulatory Agreement between HUD and the project owner ("the agreement"); (3) that the landlord has been unjustly enriched by the collection of rents not authorized by the

---

**1.** 12 U.S.C. §§ 1701 *et seq.* (1982).

**2.** N.Y.PRIV.HOUS.FIN.LAW §§ 1 *et seq.* (McKinney 1976).

**3.** N.Y.C.ADMIN.CODE Chapter 61, §§ B61.0(a) and (b).

**4.** Plaintiffs Jan Allen Reiner, Peter Fairchild and Joseph Bilera bring this action individually and "on behalf of all others similarly situated". However, there has been no class certification, resolution of that issue having been stayed pending decision of the instant summary judgment motions.

agreement; (4) that the landlord has been unjustly enriched by virtue of having made mortgage payments to the City from allegedly unauthorized rents, and (5) that the City has been unjustly enriched by accepting mortgage payments from the landlord with knowledge that the payments were made from unauthorized rents collected by the landlord.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure all of the defendants move for summary judgment on the ground that (1) the tenants have no standing under the agreement to contest rental increases and (2) the tenants were not entitled to notice of or an opportunity to comment on the owners' application to HUD for a rental increase. The City and HDC move for summary judgment on the further ground that the complaint fails to state a cause of action against either of them.[5] The plaintiffs cross move for summary judgment against each of the defendants, asserting that the law requires conclusions opposite to those urged by the defendants.

For the reasons set forth below the defendants' joint motion for summary judgment is granted and the complaint is dismissed.

### I. Statutory and Regulatory Background

#### The National Housing Act

Pursuant to Section 223(f) of the National Housing Act the Secretary of HUD is authorized, at his discretion, to enter into contracts of insurance with mortgagees which are State or local agencies.[6] The mortgages to be insured must meet the eligibility requirements specified in the regulations promulgated in Title 24 of the Code of Federal Regulations, Part 207.-32a(k).[7] That section requires that the State or local government, or agency, enter into an agreement with the Commissioner[8] by which the mortgagee establishes a special fund for the purpose of partially reimbursing the Commissioner in the event HUD is called upon to pay an insurance claim on a defaulted mortgage. Such an agreement must contain assurances by the State or local government, or agency that:

> The projects securing the mortgages in each portfolio shall not be subject to rent controls by the State, or a political subdivision thereof, or by any authority regulating rents pursuant to State or local law....[9]

Generally, the procedure for effectuating a Section 223(f) refinancing in New York City involves four steps: 1. HDC, on behalf of the City, applies to HUD pursuant to Section 223(f) for a commitment to insure a portion of a Mitchell-Lama mortgage; 2. HUD issues a commitment indicating the principal amount of a mortgage on the property involved that HUD is prepared to insure; 3. the City divides the Mitchell-Lama mortgage into a Senior Mortgage in a principal amount equal to HUD's insurance commitment and a Subordinate Mortgage in a principal amount equal to the remainder of the face amount of the initial mortgage and accrued unpaid interest; 4. HUD insures the Senior mortgage and enters into a Regulatory Agreement with the owner, which, together with the statute and HUD regulations, subject the project to HUD's supervision.

---

**5.** In their moving papers and during oral argument on the motion counsel for the City represented that the City and HDC argue this point only in the event that the defendants do not prevail on the other grounds urged in the joint memorandum for summary judgment. Since summary judgment is granted on the grounds set forth in the memorandum we do not consider these points.

**6.** Section 223(f) authorizes the Secretary to administer the program under a variety of different Sections of the NHA. The Secretary has elected to administer the 223(f) program under Section 207.

**7.** Housing and Urban Development, 24 C.F.R. § 207. 32a (1984).

**8.** "Commissioner" refers to the Federal Housing Commissioner acting on behalf of the Secretary of Housing and Urban Development. 24 C.F.R. § 200.4.

**9.** 24 C.F.R. § 207.32a(4)(k)(i).

## The Mitchell-Lama Law

Article 2 of New York State's Private Housing Finance Law ("Mitchell-Lama") provides benefits such as partial property tax exemptions and tax exempt mortgage financing to private enterprises which construct and maintain low cost housing accommodations for persons qualified under the law to be tenants. Individuals who form "Limited-profit housing companies" pursuant to the law are subject to the supervision and control of the Supervising Agency. Even if a limited-profit housing mortgage is refinanced under the federal 223(f) program it remains governed by the provisions of the Mitchell-Lama statute, rules and regulations

> except as provided otherwise by agreement with, or regulations of, the U.S. Department of Housing and Urban Development (HUD). In general, all matters involving management, maintenance, and operation shall be supervised by HUD.[10]

In 1976 the New York State Legislature amended Section 31 of Mitchell-Lama to add the following:

> Where the mortgage loan of the company is insured or held by the federal government or where a project is owned by the federal government, rental rates shall be varied without regard to the provisions of any general, special or local law which would otherwise limit or control such rental rates or the determination or variation thereof for so long as such mortgage loan remains outstanding or the project financed by such a mortgage loan is owned by the federal government.[11]

## The Merola Law

Section B 61.0 of the Administrative Code of the City of New York (the "Merola Law") was enacted to govern the procedure for instituting rental increases in City-aided Mitchell-Lama projects. It provides in relevant part:

> a. Before acting upon any application or motion for an increase in the maximum rental per room to be charged tenants and cooperators of dwellings where the housing and development administration [[12]] of [sic] the 'supervising agency' under the provisions of the private housing finance law, a public hearing shall be held. Said hearing shall be held upon no less than twenty day's written notice to the tenants and said notice shall have annexed thereto a copy of the application or motion for increase in rentals and shall set forth the facts upon which the application or motion is based.

### II.

The facts of this case are substantially undisputed. West Village Houses is a development containing 420 apartments which was initially constructed as a City-aided Mitchell-Lama cooperative project. The project was granted, and still enjoys, partial real property tax exemption by the City, and the development of the project was financed by a $23,961,700 City mortgage loan.

In September, 1975, when the then owner of the project defaulted on its obligations under the mortgage the City commenced a foreclosure action in the Supreme Court, New York County. The court appointed the Administrator of HPD[13] as receiver and authorized him to complete construction of the project, to retain a rental and managing agent and to rent the apartments at market rentals.

In the Spring of 1976 the rental program was commenced by an independent rental and management agent retained by HPD.[14]

---

**10.** N.Y.PRIV.HOUS.FIN.LAW § 13.

**11.** *Id.* § 31.

**12.** The Housing and Development Administration ("HDA") was the predecessor agency to the Department of Housing Preservation and Development ("HPD").

**13.** HPD is the supervising agency of City-aided Mitchell-Lama projects. N.Y.PRIV.HOUS. FIN.LAW §§ 2(15) and (17).

**14.** The first management agent was Mandel Management Company. Grenadier Realty Corp. took over management of the project from January 1, 1977 to about March 20, 1980,

Substantially full occupancy was achieved by September of that same year. Until September 13, 1978, when the receivership was terminated, tenants were charged the going market rate at the time of the rental. Thus, as a general rule the later an apartment was rented the higher the rental rate, since market rates for Manhattan residential properties were increasing during the period.

On August 5, 1977 HDC submitted an application to HUD for mortgage insurance for the project under Section 223(f). A rental schedule which represented the rent roll then in effect at the project was attached to the application. On March 2, 1978, HUD issued a commitment to insure a mortgage on the project in the amount of $12,034,500. The commitment contained a rental schedule virtually identical to the one supplied to HUD by HDC.

At the closing on September 13, 1978 the City's original mortgage was divided into (1) a Senior mortgage of $12,034,500 and (2) a Subordinate mortgage in the amount of $11,927,200 plus accrued unpaid interest. The receivership of the Administrator was terminated and control of the project was reconveyed to the owner. Finally, HUD insured the Senior mortgage and entered into a Regulatory Agreement with the owner.

The agreement provides that "Owners shall make dwelling accommodation and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary." Def. Exh. D, Regulatory Agreement ¶ 4(a). The contract further provides that HUD will consider requests for increases in a previously approved rental schedule to compensate for increased costs over which the owner has no control or to provide funds to pay debt service under the Subordinate Mortgage if "market conditions warrant" and the economic stability of the project will not be jeopardized. *Id.* at ¶ 4(c).

The rental schedule annexed to the Regulatory Agreement at the time it was signed in September of 1978 was a copy of the one contained in the commitment issued by HUD in March of 1977, and was therefore almost identical to the original schedule submitted with the application thirteen months earlier. However, since the rental rates had been increasing proportionate to market rates between August 1977 and September 1978 the schedule approved by HUD in September, 1978 inaccurately reflected the rent role actually in effect at the project at the time the Regulatory Agreement became effective.

The discrepancy between the actual rent roll and the one approved by HUD was discovered a few months after the owner resumed operation of the Project. By letter dated March 27, 1979 the owner's managing agent requested that HUD correct the schedule. In response on June 21, 1979, HUD advised the owner that upon receipt of a complete application HUD would consider the request, an action which they later described as a "denial" of the owner's March application.

At some point between the owner's letter to HUD and HUD's response the tenants learned of the owner's request and wrote to HUD seeking an opportunity to comment on the owner's application. Despite HUD's "denial" of the owner's March request the tenants remained concerned about their rights with respect to rent setting procedures. In an apparent attempt to set up a procedure which would allow them to say as to HUD's consideration of future increase applications, the tenants requested, and were granted, a meeting with HUD representatives. At that meeting on July 24, 1979 the tenants were told that it was HUD's view that they had lost certain rights enjoyed by them under the old status as a Mitchell-Lama project. Nevertheless, HUD advised the tenants that in all

---

at which time the responsibility was assumed by Kreisel Company Inc., the present manager.

Only the latter two are defendants in this action.

likelihood a written request by them to review future rent increase submissions would be granted.

On September 30, 1979 the project's managing agent posted a notice in each building of the complex informing the tenants of the owner's intent to file for an increase in the maximum gross potential rents. The owner applied to HUD for an increase from $2,452,857 to $2,698,143 on October 15, 1979. HUD allowed the tenants to review the owner's submissions and on November 10, 1979 certain tenants submitted written comments and materials to HUD in opposition to the application.

At the subsequent request of HUD, the owner submitted further information pertinent to the October application. Moreover, on February 22, 1980 in addition to submitting requested documents, the owner added papers seeking an increase in excess of $1,000,000 above the amount proposed by the owner on October 15. The latter increase was eventually granted by HUD, internally on May 15, 1980, and by formal action on July 22, 1980, without the tenants having been made aware of the increased application. This approval by HUD was the catalyst for the present suit.

### III. *Plaintiffs' Standing Under the Regulatory Agreement*

The tenants assert claims against the owners, the managing agents, the City, HDC and HUD, the gravamen of which is that the rentals charged after September 13, 1978, in excess of those provided for in the rental schedule annexed to the Regulatory Agreement, were legally impermissible. In answer the defendants argue that the tenants have no standing to enforce the Regulatory Agreement between HUD and the project owners because they are not intended beneficiaries of the contract.

The defendants correctly assert that every federal court that has considered the issue of whether tenants are "intended" or "third party" beneficiaries of Regulatory Agreements entered into between HUD

and project owners under HUD's various mortgage insurance programs have held that they are not. *See, e.g., Falzarano v. United States,* 607 F.2d 506, 511 (1st Cir. 1979) (§ 221(d)(3) program, below-market interest rates for insured mortgages, 12 U.S.C. § 17151(d)(3)); *Ellis v. HUD,* 551 F.2d 13 (3d Cir.1977), *aff'g,* No. 75–1721 (E.D.Pa. April 8, 1976) (§ 220 program, mortgage insurance for projects built in urban renewal areas, 12 U.S.C. § 175k); *Harlib v. Lynn,* 511 F.2d 51, 55–56 (7th Cir.1975) (§ 221(d)(3) program); *LeGrand Reed v. Esplanade Gardens, Inc.,* No. 80 Civ. 3780 (S.D.N.Y.1981) (§ 223(f) program). Plaintiffs do not dispute that these have been the federal rulings but argue that those decisions do not control this case. Relying primarily on *Zigas v. Superior Court of the State of California,* 120 Cal.App.3d 827, 174 Cal.Rptr. 806 (1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 655 (1982), the tenants argue that the facts of this case compel the conclusion that they are third party beneficiaries of the Regulatory Agreement. In *Zigas,* the California court held that tenants of a housing project had standing to enforce a regulatory agreement when the landlord was collecting more rent than the agreement authorized and the government failed to take action against him. However, *Zigas* is inapplicable to the instant action because, unlike *Zigas,* in which the third party beneficiary issue was decided based upon state law (since the suit was between private parties and raised no question regarding the liability of the United States) in the present case a federal government agency is a party and the outcome of this case will affect financial obligations of the United States. Accordingly, federal common law governs. *See United States v. Standard Oil Co.,* 332 U.S. 301, 307, 67 S.Ct. 1604, 1907, 91 L.Ed. 2067 (1947); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *Holbrook v. Pitt,* 643 F.2d 1261, 1270 n. 16 (7th Cir.1981).[15]

---

**15.** Even under state law principles plaintiffs' reliance on *Zigas* is misplaced. The California

court found that the federal cases which held that tenants are not third party beneficiaries of

■ It is established as a matter of federal law that to be entitled to enforce a contract a third party must be an intended, and not merely an incidental beneficiary. *See, e.g., Holbrook v. Pitt,* 643 F.2d at 1270. With respect to mortgage insurance Regulatory Agreements between HUD and project owners federal courts have consistently held that tenants of the projects are neither creditor, nor donee beneficiaries. *See, e.g., Falzarano v. United States,* 607 F.2d at 511; *Harlib v. Lynn,* 511 F.2d at 55–56; *see also LeGrand Reed v. Esplanade Gardens, Inc.,* No. 80 Civ. 3780, slip op. at 23–24.

■ In *Ellis v. United States Department of Housing and Urban Development,* No. 75–1721 (E.D.Pa. Apr. 8, 1976), *aff'd,* 551 F.2d 13 (3d Cir.1977), the default provision of the Regulatory Agreement which the plaintiffs sought to enforce as third party beneficiaries was identical to the default provision in the case at hand.[16] The provision specifically empowers the *Secretary of HUD* to take various actions in the case of a breach of the agreement by the owner. The district court concluded and the third circuit affirmed, that the provision contained the *exclusive* remedies for a breach and held that there was no expression of intention that the plaintiffs-tenants were to be obligees of the Regulatory Agreement.

The *Ellis* analysis is applicable here since, as indicated, the default provisions are the same. Moreover, the Regulatory Agreement between HUD and West Village contains no provision which indicates an intent contrary to what is expressed in the default paragraph giving the Secretary the exclusive right to enforce the contract.

We conclude the tenants are not intended beneficiaries of the agreement and therefore have no standing to enforce it. Accordingly, plaintiffs' second, third, fourth and fifth causes of action, each of which are based upon the Regulatory Agreement, are dismissed.

## IV. *Plaintiffs Due Process Claim*

### Applicability of Merola

The primary issue presented by the cross-motions for summary judgment is whether the due process clause of the Fifth Amendment gives the tenants of a housing project constructed under the Mitchell-Lama Law the right to notice of, and an opportunity to comment on, the owner's application for a rent increase before HUD approves it. Determination of the question depends on (1) whether the tenants' interest in receiving notice and the right to comment before a rent increase occurs is a constitutionally protected "property interest" and (2) whether there is sufficient government involvement to invoke the due process clause.[17] The defendants argue that neither the National Housing Act, the Mitchell-Lama Law, the Merola Law, nor HUD's own regulations grant the tenants a constitutionally protected property interest. The plaintiffs do not respond to the defendants' arguments that the NHA and the Mitchell-Lama Law do not grant the tenants a protected property interest, but rely instead on the Merola Law and the landlord's and HUD's practices and procedures. Turning first, then, to the Merola Law, as a threshold matter it must be determined whether that law was applicable to the

a regulatory agreement were distinguishable from the action before them because in *Zigas* the contested rent increase was *never* HUD approved. That is not true of the disputed increase in this case.

**16.** The relevant portion of ¶ 9(g) states:
Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice, thereof, to Owners, .... If such violation is not corrected to the satisfaction of the Secretary within thirty

(30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may: [take various other action].

**17.** A third prong of the analysis, "what process is due?", is not at issue here with respect to the plaintiffs' due process claims.

project after the date of the refinancing, that is September 13, 1978.[18]

The defendants contend that, whatever applicability the Merola Law may have had to the project before 1978,[19] the law was inapplicable to the project after the refinancing because of (1) HUD's assumption of management of the project and (2) the 1976 amendment to Section 31 of Mitchell-Lama, which provides in relevant part that

... rental rates [in HUD-insured Mitchell-Lama projects] shall be varied without regard to the provision of any general, special or local law which otherwise would limit or control such rental rates or the determination or variation thereof.

Plaintiffs respond that because the City continued to hold the subordinate Mitchell-Lama mortgage, despite the refinancing, the project remained a City-aided Mitchell-Lama project governed by Merola and under the partial supervision of HPD. They add that Merola is not within the purview of or affected by the Section 31 amendment because Merola is merely a procedural measure which does not restrict HUD's rent setting power.

In particular plaintiffs argue that the notice and hearing provisions of Merola do not purport to "limit", "control", "determine" or vary any rental rates. The contention, however, is premised on a misreading of the statute and is contrary to the "ordinary meaning" of the words used. *See, e.g., Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) (In the absence of evidence to the contrary it is to be assumed that the legislative purpose is expressed by the ordinary meaning of the words used). As we read the statute it suspends the applicability of laws which: (1) limit or control ... rental rates; *or* (2) limit or control the *determination* of ... rental rates; *or* (3) limit or control the *variation* of ... rental rates.

■ Nevertheless, even if Merola were deemed merely to set forth a "procedure", the practical result of holding that Merola is applicable to HUD would be to prohibit HUD from approving any rental increase

---

**18.** The defendants maintain, *inter alia,* that the Merola Law is invalid since it conflicts with the broad powers and discretion granted to HPD relating to rent increases under the state Mitchell-Lama Law and therefore was never applicable to the Project. The arguments on this point on their face have appeal. Nonetheless, the issue of whether Merola is invalid when construed with the state law has yet to be decided by the New York courts. In view of the fact that summary judgment is granted for the defendants on other grounds, we do not address this novel question of state law. *Cf., Perry v. Sindermann,* 408 U.S. 593, 604, 92 S.Ct. 2694, 2717, 33 L.Ed.2d 570 (1972) (Burger, C.J., concurring) ("Because the availability of the Fourteenth Amendment right to a prior administrative hearing turns in each case on a question of state law, the issue of abstention will arise in future cases .... If relevant state law is unclear, a federal court should, in my view, abstain....").

**19.** The defendants do not dispute that the rentals in the project were subject to regulation by HPD pursuant to the provisions of Mitchell-Lama at least until September 13, 1978. Indeed, evidence submitted by the defendants in support of their joint motion supports this conclusion. *See* Lerner Affidavit at ¶ 2. Nor do the defendants dispute plaintiffs' assertion that the procedure for effecting rent increases at

City-aided Mitchell-Lama projects is governed by the provisions of Section B 61.0 of the Administrative Code of the City of New York, i.e., the Merola Law, and that such provisions have been adopted by HPD in its regulations. However, the defendants argue that since the rents in the project were originally established by court order resulting from the foreclosure, and not by HPD, it follows that Merola, which provides for a hearing prior to HPD action on a rent increase, never applied to the project. As previously stated, when the Supreme Court, New York County, authorized the receiver to rent the apartments, each was rented at the market rate prevailing at the time of the individual rental. Since market rates were climbing during the period from the Spring of 1976 through September 13, 1978, the amount of rent paid by tenants in the project varied depending on when they rented an apartment unit. However, no tenant was subjected to a rent increase during the time he remained in his apartment and none requested a hearing to contest such an increase. Nonetheless, although no occasion may have arisen between 1976 and 1978 in which the hearing requirement would appropriately have been *applied* in this project, that fact does not justify the analytical leap necessary to conclude that the Merola Law was inapplicable. However, since we conclude that Merola was not applicable after 1978 in any event, we do not decide this issue.

request in Mitchell-Lama projects without first providing 20 days advance notice to the tenants and holding a public hearing.[20] If Merola was applied, HUD would still be free, after holding such a hearing, to approve an owner's application even if presented with compelling reasons why a requested rate increase is unwarranted. Thus, the *power* of HUD to determine rents would not be constrained. However, our analysis assumes serious compliance with Merola, which, if it is to serve a valid purpose, mandates not only a hearing, but also requires that the criticisms, comments and information received are carefully evaluated and factored into any rent setting determination. Consequently, to require HUD to comply with Merola would, in effect, limit or control HUD in its determination or variation of rental rates, not only by mandating procedures and setting restrictive time frames, but also by governing the information which would control the outcome. This seems to be the result against which the amendment of Section 31 of Mitchell-Lama was meant to protect.

Moreover, as indicated below, the motivation behind the enactment of Section 31 and the manner upon which it was relied by HUD and the City in entering into a Reimbursement Agreement, supports this interpretation. The defendants argue, and the plaintiffs do not disagree, that the 1976 amendment was enacted to enable the state, and its political subdivisions, to meet the qualifications for obtaining mortgage insurance. HUD's regulations require the signing of a Reimbursement Agreement, and the agreement must warrant that the project for which mortgage insurance is sought is not subject to rent controls by the state, or any political subdivision thereof. 24 C.F.R. § 207.32a(k)(i). Paragraph four of the Reimbursement Agreement entered into by HUD and the City states:

HDC and HDA represent and warrant that pursuant to state legislation,

(1) The projects which constitute the security for the mortgages included in the portfolio are not subject to rent controls by the State of New York or any political subdivision thereof or any authority regulating rents pursuant to State or local laws, or to the requirements of Chapter 61, Section B61.0, subdivisions (a) and (b) of the New York City Administrative Code (the "Merola Law") concerning procedures for increasing rents and the timing of such rental increases. ...

This language makes it clear that the City interpreted the provisions of Section 31 as excluding HUD mortgage-insured projects from the operation of the Merola Law. Although the City's interpretation is not decisive as to whether by amending the law the State legislature intended to pre-empt the applicability of Merola to such projects, the clause in the agreement is significant evidence that that was the legislative purpose.

In further support of their contention that Merola is still viable, plaintiffs rely on Article XX, Section 1 of HPD's Rules which provides that housing companies refinanced under the 223(f) program remain subject to Mitchell-Lama and the Rules and Regulations governing City-aided limited-profit housing companies. However, that Section also states that the cited provisions apply *"except as provided otherwise by agreement with, or regulations of ... HUD."* (Emphasis supplied). Moreover, as the defendants correctly point out, Section 7 of HPD's Rules states in pertinent part:

HUD will be responsible for the approval of all rent/carrying charge increases with respect to all refinanced developments.[21]

---

**20.** As the defendants correctly assert, unlike the limited due process protection which has been granted to tenants contesting a rental increase based on a legitimate claim of entitlement, *see Burr v. New Rochelle Municipal Housing Authority,* 479 F.2d 1165 (2d Cir.1973), the Merola Law requires a public hearing involving a hearing officer, testimony and other formal attributes.

**21.** Although not decisive of the question before us, we note the defendants' argument that as a practical matter, the Merola requirement that *HPD* give notice and hold a public hearing is inconsistent with the 223(f) program under which *HUD* is responsible for rent regulation; plaintiffs do not address this discrepancy.

When read together with HUD's Regulations and the Reimbursement Agreement, HPD's Rules support a conclusion that Merola is no longer viable after the 1976 amendment to Section 31 of Mitchell-Lama.

For the foregoing reasons we find the Merola Law was not applicable to West Village House after September 13, 1978.

### Claimed Sources of Entitlement

Having concluded that Merola was not applicable to the project after the date of the refinancing, in September 1978, the question remains whether the tenants possessed a legitimate entitlement sufficient to invoke a right to procedural due process. The defendants argue that if the Merola Law was pre-empted by the refinancing, and we have concluded that it was, any previous "entitlement" of the plaintiffs arising from it was terminated. Plaintiffs respond that they clearly had an entitlement before the refinancing and they continued to possess it after September 1978 because the previous applicability of Merola had established a practice which gave rise to the tenants' reasonable expectation of a benefit within the meaning of *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

Although any tenant undoubtedly has a general interest in not having his rent increased, the right to procedural due process exists only when the interest in question rises to the level of a "property interest" as that term is defined, most notably, in *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972):

> To have a property interest in a benefit a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it....
>
> Property interests, of course are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state-law rules or understandings that secure certain benefits

and that support claims of entitlement to those benefits.

In *Roth*'s companion case, *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Court elaborated on its holding in *Roth,* concluding that an individual may be entitled to due process protection where he legitimately relies on "policies and practices" which create a reasonable expectation to a benefit.

Thus, the analysis must focus on the plaintiffs' claimed source of entitlement and whether plaintiffs had a legitimate basis to expect a benefit. Applying the *Roth-Sindermann* formula the Second Circuit held in *Grace Towers Tenants Association v. Grace Housing Development Fund Co.,* 538 F.2d 491 (2d Cir.1976) that Section 221(d)(3) of the National Housing Act did not provide the tenants of a federally *subsidized* housing project with a legitimate entitlement. The court found that the purpose of the 221(d)(3) program was to promote the construction of housing by private enterprise, *Id.* at 494, and to accomplish that objective rent regulation was left to the "experienced discretion" of the Secretary. From these findings the court concluded the tenants could not legitimately expect either immunity from rental increases or participation in the process.

A different result had been reached in *Burr v. New Rochelle Municipal Housing Authority,* 479 F.2d 1165 (2d Cir.1973). There the tenants resided in apartments "controlled and operated by ... a public corporation organized under New York State law to provide low rent housing for persons of low income." The court held the tenants possessed a property interest under *Roth,* and that they were entitled to limited procedural safeguards prior to the landlord's imposition of across the board rent increases. However, the court did not focus on the claimed source of entitlement in their decision. Moreover, the above-quoted language, as well as the decision of the lower court, 347 F.Supp. 1202, 1205–6 (S.D.N.Y.1972) which the Second Circuit affirmed in relevant part, make it clear that the fact that the landlord itself was a "pub-

lic body" was an important factor in finding a due process entitlement.

Plaintiffs rely heavily on *Gramercy Spire Tenants Association v. Harris*, 446 F.Supp. 814 (S.D.N.Y.1977). The tenants in *Gramercy Spire* lived in apartments governed by the New York City Rent Stabilization Law ("RSL") and the court concluded that since they were the "intended beneficiaries" of the RSL, the law conferred upon the tenants a statutorily created property interest which entitled them to due process protection. However, the *Gramercy* apartments were under the *concurrent* regulation of the federal government and the City rent control laws from 1969 until HUD pre-empted the City laws in 1976. Here, in contrast, the City Merola Law became inapplicable to the project once it was under federal regulation by virtue of the amended Section 31 of the State Mitchell-Lama law.

Further, in contrast to the situation in *Gramercy Spire*, West Village Houses, the project in this case, has never been subject to New York City rent control laws.[22] However, a major purpose of Mitchell-Lama is to provide adequate housing to low income tenants, and West Village Houses is controlled by a company incorporated pursuant to that law. The certificate of incorporation states:

> The Company has been organized to serve a public purpose.... All real and personal property acquired by it, and all structures erected or rehabilitated by it, shall be deemed to be acquired, rehabilitated or created for the proper effectuation of the purposes of the Act.

Moreover, assuming *arguendo*, that Merola was applicable before September 1978,[23] the tenants had a specific statutory right to notice and public hearing prior to the institution of rental increases. Thus, there is a strong argument for the proposition that under *Roth* and *Burr* the tenants at one time may have possessed a property interest to which due process attached. The question remains, however, whether that interest continued *after* the federal refinancing. The issue appears to be one of first instance.

Under *Roth* and *Sindermann* a determination that an entitlement exists depends on finding both that a statute (or rules or regulations) conferred an intended benefit on the plaintiff and that the conferring act is in effect at the time the claimed right to due process arises. As the *Roth* court put it: "[property interests] ... are defined by *existing* rules ... *that secure certain benefits* ...." 408 U.S. at 564, 92 S.Ct. at 2702 (emphasis supplied).

Here, there is no question that Merola secures certain benefits, namely, the right to notice of and an opportunity to comment on any proposed rent increase. Further, the law is, literally, in existence. However, since we have concluded that Merola was no longer applicable to West Village Houses once the development was refinanced through the Federal 223(f) program in September 1978, we accordingly conclude that after that date Merola no longer conferred a benefit upon the tenants who reside in the housing complex. *Cf., Goldberg v. Kelly*, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1969) ("[Welfare] benefits are a matter of statutory entitlement *for persons qualified to receive them*.") (Emphasis supplied).

We recognize that in *Roth* and *Sindermann* the Supreme Court was not faced with the question whether a statutory entitlement would continue to exist if the statute was later declared inapplicable. Nor, as previously stated, have we uncovered any other decisions which address the issue. However, in the very context of

---

**22.** Construction of the project was not completed prior to January 1, 1974, and post-January 1, 1974 buildings are not covered by New York's Rent Control or Stabilization Laws. N.Y. UNCONSOL. LAWS § Y51–3.0(h) (McKinney 1974) (New York City Rent Control Law); N.Y. UNCONSOL. LAWS §§ YY 51–3.0(a)(1) (McKinney 1974) (New York City Rent Stabilization Law); N.Y. UNCONSOL. LAWS § 8625 (McKinney Supp.1983–84) (Emergency Tenant Protection Act).

**23.** *See* footnotes 18 and 19, *supra*.

tenants' rights it has been held that a "property interest" possessed by a tenant in a government housing project is terminated when the nature of the project changes. *Russell v. Landrieu*, 621 F.2d 1037 (9th Cir.1980) (Low income housing project tenants did not continue to maintain statutory entitlement to operation of project for low income renters after foreclosure on property by HUD and conveyance to later purchaser). Accordingly, we conclude that notwithstanding the fact that the plaintiffs may have been entitled to claim a "property interest" before September 1978, once the housing development became subject to federal regulations, the tenants in West Village no longer possessed such an entitlement.

Plaintiffs next assert that even if they do not possess a property interest under Merola, they legitimately relied on a "practice" established by HUD and the landlord when those parties gave plaintiffs notice and an opportunity for comment on the October 1979 increase application. The defendants answer that a "prior" practice could not have been established because (1) there were no rental increases for tenants in occupancy between its opening and the 1980 HUD-approved increase and (2) the February 22, 1980 request for a further increase was merely supplemental to the October request.

We find that the October and February requests constituted two separate applications because in spite of the fact that the second request did not include an entirely new set of forms, the landlord asked for a substantial increase over the initial application. The issue then, is whether the fact that the landlord posted notice and HUD allowed the tenants an opportunity to comment on the landlord's October application created a "practice" giving rise to a legitimate expectation of future participation.

The cases appear to find that a "practice" may arise in two ways: (1) where, as discussed above, a policy or procedure is contained in some form of written guidelines, *see Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (teacher legitimately relied upon guidelines promulgated by the Coordinating Board of the Texas College and University System which provided that a teacher like himself had some form of job tenure); *Argo v. Hills*, 425 F.Supp. 151 (E.D.N.Y.1977) *aff'd. mem.*, 578 F.2d 1366 (2d Cir.1978) (tenants had a legitimate expectation that their rents would not be increased without the procedures provided for in the Rent Stabilization Law being followed) or (2) less frequently, where a "custom" has been established. *Cf., Lopez v. Henry Phipps Plaza South, Inc.*, 498 F.2d 937 (2d Cir.1974) (custom of renewal of leases under Federal Housing and Development Act gave tenants a property interest in continued occupancy and entitled them to some procedural safeguards in eviction proceedings). Here no written guidelines exist and no custom was ever established.

■ On September 30, 1979 the owner posted notice of his intent to file a rent increase. In November of that year HUD allowed the tenants to file comments in objection to the application. Based upon these actions the tenants assert the existence of an "established practice". No authority is cited for this proposition, and we conclude that the one-time occurrence on which plaintiffs rely is not enough under the decisions in this Circuit to have established a practice out of which due process protection arises.

■ Finally, plaintiffs argue that HUD's New York Office's voluntary adoption on July 11, 1980 of an internal procedure which would allow tenants in developments under the 233(f) program to have notice and an opportunity for comment on rent increase applications, created an entitlement. The defendants respond that (1) the owner's application had already been internally approved before the date of the adoption of the new procedures and (2) the new procedures were not intended to cover pending applications.

Documentary evidence in the record establishes that HUD had internally approved the owner's application as early as May 15, 1980 and that by letter of June 27,

1980 the owner was advised that formal approval was imminent. Moreover, the affidavit of Alexander Naclerio, Director of Housing in HUD's New York Office represents that the new procedures were adopted and went into effect after the approval of the West Village application.

Upon the foregoing facts and, in light of the United States Supreme Court's holding in *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) that deference to the interpretation given an administrative regulation by the officers or agency charged with its administration is particularly in order, we find that the procedures adopted by the New York office were not applicable to West Village. It follows that the adoption of such procedures did not confer a benefit under which the tenants had a due process right.

### V. *Government Involvement*

We have concluded above that Merola was no longer applicable to the project after September 1978. However, even if it were concluded that the plaintiffs legitimately relied on the continuing existence of Merola, the question would remain whether the existence of governmental involvement in this case was sufficient to invoke the due process clause, the absence of which would defeat plaintiffs' claim. The defendants do not directly address the issue of government action, arguing only that the due process clause has not been invoked here because this case is not an instance in which the government has pre-empted any local rent control laws. The plaintiffs assert that sufficient government involvement exists because the owners have been assisted in their venture by extensive governmental support under Mitchell-Lama. Although this is not such a case, they contend that where the government acts as landlord the tenants are entitled as a matter of right to notice of proposed rent increase applications and the right to comment thereon. There appear not to be any decisions which clearly resolve the question whether there is sufficient government action to invoke the clause on the facts presented in the instant case. However,

determinations by the courts in this Circuit do set parameters by providing examples of when the government's role is, and is not sufficient to require due process.

The leading case is *Langevin v. Chenango Court, Inc.,* 447 F.2d 296 (2d Cir.1971). *Langevin* involved a government authorized rental increase in a federal mortgage insurance § 221(d)(3) project. The court held that it was insufficient to invoke the due process clause since the government itself did not raise the rents, but rather, HUD merely "... allowed the landlord to institute an increase ... which he would have been legally free to do but for its regulatory agreement ...." The court stated:

> The due process clause does not forbid Congress from deciding, if it wishes, that federal assistance to 'private industry in providing housing for low and moderate income families and displaced families' in the form of insurance and purchase of low interest mortgages need not be conditioned on the granting of an evidentiary hearing with respect to rent increases, but, in the absence of some governmental scheme of rent control, whether general or particularized, may instead be confided to the decision of the experienced staff of the FHA, which has been instructed to subject rent increase applications to thorough investigation to the end that tenants should not be imposed upon.

*Id.* at 301.

In contrast with *Langevin* it is clear that where the government is itself the landlord due process *will* be invoked. *See, e.g., Burr v. New Rochelle Municipal Housing Authority,* 347 F.Supp. 1202 (S.D.N.Y. 1972), *aff'd in relevant part,* 479 F.2d 1165 (2d Cir.1973).

Since *Langevin* the question of government action in the context of project rentals has been addressed by several District Courts within this Circuit. In *Klein v. Dept. of Housing and Urban Development,* 416 F.Supp. 615 (E.D.N.Y.1976) the facts were that at the time HUD authorized rental increases in the apartment project

on which it had, as here, merely insured the mortgage, "no local agency-exercised or was endeavoring to exercise authority over the rents". *Id.* at 617. Relying on *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, the court held:

> It is beyond dispute that when an agency of the United States, acting as a mortgagee, merely permits a landlord to increase rents and in no way repeals a local government rent control regulation such permission need not be preceded by hearings at which the tenants may be heard.

*Klein v. Dept. of Housing and Urban Development*, 416 F.Supp. at 617 (citations omitted); *but see cf., Caramico v. Secretary of the Dept. of Housing and Urban Development*, 509 F.2d 694 (2d Cir.1974) (where government's own regulations *required* the landlord to take certain specified action which impacted on the tenants there was sufficient governmental involvement to invoke due process).

In contrast to *Klein, Argo v. Hills*, 425 F.Supp. 151 (E.D.N.Y.1977), *aff'd mem.*, 578 F.2d 1366 (2d Cir.1978), involved an apartment project with a HUD insured mortgage which was subject to the New York City Rent Stabilization Law and Rent Stabilization Code. When the local rent control board did not act upon the landlord's request for a rent increase, HUD determined that its interest in the guaranteed mortgage was in jeopardy and eventually issued a formal certification that it had pre-empted local rent controls pursuant to HUD regulations to protect the government's interests. The court held that the § 207 program alone was insufficient governmental involvement to invoke due process, but that where the government had not only insured the mortgage but had also taken the active measure of pre-empting local (rent control) law to insure its inter-

ests, the tenants were entitled to procedural due process. *Id.* at 156–57; *see also Gramercy Spire Tenants Association*, 446 F.Supp. 814 (S.D.N.Y.1977).

The relevant rules of law which emerge from these decisions can be summarized as follows: where HUD approves a rental increase, there is sufficient government involvement to invoke due process if the government is the landlord, or, if not the landlord, actively pre-empts local rent control law in authorizing the increase.

■ The facts of this case do not bring it within the penumbra of the decisions which found sufficient government action to require due process protection. Here the government is not the landlord and the project is not subject to New York's Rent Control or Stabilization Laws. Moreover, we have concluded in Point II above that the 1976 amendment to the Mitchell-Lama law revoked the applicability of the Merola Law to the project after September 13, 1978. HUD's 1980 approval of a rent increase, therefore, did not constitute government pre-emption of any local law controlling or restricting rents. Furthermore, although the tenants assert that there was sufficient government involvement (with the landlord) to trigger the right to due process because Washington Village Housing Corporation was organized and receives certain benefits under Mitchell-Lama (a state law), they do not explain why or how the state's involvement can be imputed to the federal government, against whom the tenants assert the due process claim. Finally, there is no allegation in the case at bar that the government in any way required the landlord to seek an increase in the project rents. Accordingly, we conclude that there is insufficient government action to invoke the due process clause in the instant action.[24]

---

**24.** While we have concluded that the plaintiffs are not entitled to due process protection as a matter of law, there are also compelling policy considerations which lend additional support to this result. Although there are State statutes which continue to govern West Village Houses, management of the complex, including rents, is subject to the control of the federal government and is governed by federal laws and regulations. It is notable that the stated goal of the state program pursuant to which, in certain instances, Merola attaches, is to provide safe, low-cost housing. In contrast, this circuit has held that although suitable housing is one objective of the

For the foregoing reasons the defendants' joint motion for summary judgment is granted and the plaintiffs' cross-motion is denied. The complaint is dismissed.

It is so ordered.

National Housing Act, the primary goal of the federal program is to encourage private industry involvement as a more efficient means by which to meet housing needs. *See Grace Towers Tenants' Association v. Grace Housing Development Fund Co.,* 538 F.2d at 494; *Langevin v. Chenango Court,* 447 F.2d at 301. The successful administration of the federal program requires flexibility to insure its continued economic feasibility and to protect the economic interests of the federal government. *See Hahn*

*v. Gottlieb,* 430 F.2d 1243 (1st Cir.1970). The Secretary has broad discretion in order to execute the statutory scheme. *See Hahn v. Gottlieb,* 430 F.2d at 1246; *Grace Towers Tenants' Association v. Grace Housing Development Fund Co.,* 538 F.2d at 494.

It would be inconsistent with these policies and objectives, as well as the general policies protected by the Supremacy Clause, to conclude that a city statute requires the federal government to be bound by its terms.