Filed 2/4/14  XTC Investments v. Bluenose Trading CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| XTC INVESTMENTS, LLC, | B241361 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC432624) |
| v. | |
| BLUENOSE TRADING, INC., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Matthew St. George, Court Commissioner.  Affirmed.

Steven W. Kerekes and Thomas D. Hogue for Defendant and Appellant.

Law Offices of Steven Sandler and Steven Sandler for Plaintiff and Respondent.

This is the third time appellant Bluenose Trading, Inc. (Bluenose) and respondent XTC Investments, LLC (XTC) have been before this court. In the first appeal, we affirmed a judgment for XTC and against Bluenose for $637,102, arising out of alleged fraudulent conveyances to Bluenose by its principal. (*XTC Investments*, *LLC v. Bluenose Trading*, *Inc.* (June 21, 2011, B226104 [nonpub opn.] (*Bluenose I*).) In the second appeal, we affirmed an order denying Bluenose's request for relief from default and default judgment, leaving in place a default judgment for XTC and against Bluenose for $586,473, arising out of another alleged fraudulent transfer. (*XTC Investments*, *Inc. v. Bluenose Trading*, *Inc.* (Aug. 1, 2012, B232729 [nonpub opn.] (*Bluenose II*).)

Bluenose made some payments to XTC in partial satisfaction of one or both of the judgments. Bluenose then filed motions, which are the subject of the present appeal, asking the trial court to order that any payments to XTC under either judgment be credited to both. Bluenose contended that both judgments compensated XTC for the same injury, and thus XTC should be permitted to recover only once. The trial court denied the motions.

We affirm. Although there appears to be at least some overlap between the two judgments, we cannot conclude on the present record that *all* of the damages included in the second judgment were also included in the first judgment. The trial court did not abuse its discretion in denying the requested relief.

**STATEMENT OF FACTS AND OF THE CASE**

**I.      Prior Litigation Between the Parties**

*A.      The Federal Action*

XTC made a series of loans to Fortuna Investment, Inc. (Fortuna), which Sanford Gaum (Gaum) personally guaranteed. The loans were not repaid, and on January 12, 2005, XTC sued Gaum, Fortuna, and others for the unpaid debt in federal district court.

The defendants did not appear in the federal action. On April 6, 2006, the federal court entered a default judgment against Gaum, Fortuna, and the other defendants for

$628,051.33, "consisting of $612,207.19 in compensatory contract damages and $15,844.14 in attorneys' fees." (*XTC Investments*, *LLC v. Fortuna Investment*, *Inc.*, U.S.D.C. Case No. CV 05-272 NM (MANx).)

### B. First State Court Action (*Bluenose I*)

In September 2007, XTC initiated an action in state court against Gaum and Bluenose (*Bluenose I*), asserting that Gaum created and used Bluenose to conceal his assets from creditors. After a three-day bench trial, the trial court found that Gaum had used a series of corporations, including Bluenose, to hide assets from creditors. Specifically, the court found that after acquiring a commercial property in Pico Rivera (the Pico Rivera property), Gaum transferred the property to Bluenose in exchange for an 80 percent interest in Bluenose. Bluenose's sole business was the ownership and management of the Pico Rivera property. In April 1994, Gaum transferred his 80 percent interest in Bluenose to Nova Gold, a corporation owned entirely by him. On May 15, 1995, Gaum transferred his interest in Nova Gold to his brother, Errol, a Canadian resident. No money changed hands for this transaction. (*Bluenose I* [at p. 3].)

As property manager of the Pico Rivera property, Gaum collected and deposited rents, negotiated leases, and otherwise acted as an on-site manager; he also prepared all income/expense statements, managed expenses, kept records for federal and state tax returns, and paid California state licensing fees. Nova Gold did no management services for Bluenose and did not charge Bluenose for any of the work done by Gaum. However, on behalf of Nova Gold, Gaum wrote checks to himself for his salary, his health insurance premiums, all of his living and day-to-day travel expenses (including automobile expenses), and the rent for his residence. Further, once a year, Gaum wired money to a Canadian bank; the amount wired represented Nova Gold's profits after all expenses had been deducted. (*Bluenose I* [at p. 4].)

Based on these factual findings, the trial court concluded that Gaum, his brother, Bluenose, and Nova Gold "'worked together under a conspiracy whereby Gaum maintained absolute and total control over the Pico Rivera property and all income from

3

the property, while at the same time shielding Gaum from any of his personal creditor claims. Gaum maintained an image to the outside world that he had substantial real property assets and income, permitting him to enter into investments on the strength of his perceived credit-worthiness, while concealing from potential investors the fact that he had structured his assets so that he would be judgment-proof.'" (*Bluenose I* [at p. 5].)

The court estimated that Bluenose paid Nova Gold management fees of $318,551 during the years 2006-2008—money that "'was in fact . . . due to Gaum as compensation for being CFO and Property Manager, and that, pursuant to the conspiracy described herein, it was illegally diverted to Nova Gold to prevent the plaintiff and other creditors from learning about, attaching or garnishing Gaum's compensation.'" (*Bluenose I* [at pp. 7-8].) Further, the court found that defendants engaged in this conduct with malice, oppression, and fraud, and that Bluenose possessed sufficient assets to support punitive damages in an amount equal to XTC's actual damages. The court thus awarded plaintiff $318,551 in general damages and $318,551 in punitive damages, for a total of $637,102, plus statutory interest from April 7, 2006, to the date of judgment. (*Bluenose I* [at p. 7].)

Gaum and Bluenose appealed, and we affirmed the judgment in its entirety.

C.      *Second State Court Action (Bluenose II)*

XTC filed a second state court action on February 25, 2010, this time against Bluenose and 8600 S.V., Inc. (8600). It alleged that 8600, a Delaware corporation, was controlled by Gaum and was the record owner of real property located at 1205 Corona Drive in Glendale (the Glendale property). When XTC filed *Bluenose I*, Bluenose's Pico Rivera properties were encumbered by a single deed of trust for $800,000 in favor of Zion II, Inc. (Zion II), and 8600's Glendale property was encumbered by a single deed of trust for $505,000 in favor of Zion II. Zion II was controlled by Jonica Stingle (Stingle), who had a close personal relationship with Gaum. After the trial court announced its decision in *Bluenose I*, Bluenose transferred $505,000 to 8600 and assumed 8600's indebtedness to Zion. (*Bluenose II* [at pp. 2-3].)

4

Neither Bluenose nor 8600 answered the complaint or otherwise appeared in the action.  XTC filed a request for entry of default on July 16, 2010, and the court entered Bluenose's and 8600's default on August 11 and 12, 2010.[1]  On November 2, 2010, after a prove-up hearing, the court entered a default judgment against Bluenose and 8600 in the amount of $586,473.41, and imposed a constructive trust and judicial lien on the Glendale property.  The trial court did not detail how it calculated the amount of the default judgment.[2]  (*Bluenose II* [at p. 3].)

## II.     The Present Action

On February 22, 2012, Bluenose filed motions to credit to both the *Bluenose I* and *Bluenose II* judgments any payments it made to XTC under either judgment.  Bluenose contended that plaintiff "has suffered but a single injury and that attempting to collect on both judgments constitutes an impermissible and illegal double recovery."  It urged: "XTC incurred only one underlying injury:  the money it lost when it was not repaid on a series of promissory notes. . . .  The subsequent two state court cases both allege that the judgment debtor in the Federal Case, Sanford Gaum, conspired with Bluenose to thwart XTC's collection efforts on the original federal judgment.  In the instant case, that tort is alleged to be a conspiracy to divert income earned by Sanford Gaum which should have been available to satisfy XTC's judgment.  In the Second State Court Case, the tort is alleged to be a fraudulent transfer of a trust deed from one property to another.  XTC seeks to enforce two judgments against Bluenose for the same injury.  Even assuming, for

---

[1]     Bluenose subsequently filed a motion for relief from default and default judgment, which the trial court denied.  Bluenose appealed, and we affirmed.  (*Bluenose II.*)

[2]     Although the trial court did not detail precisely how it calculated the amount of the default judgment, our appellate record includes XTC's attorney's declaration in support of default judgment, in which counsel requested entry of judgment "in favor of plaintiff XTC Investment, LLC and against defendants 8600 S.V., Inc. [a]nd Bluenose Trading, Inc., jointly and severally, for the sum of $505,000.00, as being the value of the assets transferred, plus prejudgment interest of 10% per annum from the date of transfer on July 1, 2009 until the date of entry of judgment herein."

5

argument's sake, that it is true that Bluenose committed two separate torts to assist Sanford Gaum to avoid payment of the Federal Court Judgment against him, something which Bluenose denies, XTC cannot obtain double recovery when it has only incurred one amount of damages—the amount it is entitled to receive in the Federal Judgment against Sanford Gaum."

XTC opposed the motion. It asserted that Bluenose could not seek equitable relief because it came before the court with unclean hands and, in any event, the "damages, duties and defendants in each case are different." The trial court denied the motions without comment, and Bluenose timely appealed.[3]

**DISCUSSION**

Bluenose contends that the *Bluenose I* and *Bluenose II* judgments are duplicative of one another and, thus, any payments made on either judgment should be credited towards both. To do otherwise, Bluenose contends, would permit XTC an impermissible double recovery because "XTC incurred only one underlying injury: the money it lost when it was not repaid on a series of personal guarantees from Sanford Gaum of underlying promissory notes." For the following reasons, we do not agree.

**I.      The Double Recovery Bar**

It is well established that, regardless of the nature or number of legal theories advanced by a plaintiff, "[plaintiff] is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence. (*Shell v. Schmidt* (1954) 126 Cal.App.2d 279, 291.) Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited. (*Ibid.*)" (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158-1159.)

---

[3]      According to Bluenose, subsequent to the filing of the notice of appeal XTC levied on the Pico Rivera property and, on September 12, 2012, purchased the property at a sheriff's sale. That issue is not properly before us, and thus we do not address it.

The court applied this principle in *Fletcher v. California Portland Cement Co.* (1979) 99 Cal.App.3d 97. There, a railroad switchman employed by Southern Pacific Transportation Company (SP) was injured while performing switching operations on the premises of California Portland Cement Company (CPC). Plaintiff filed two separate actions—a federal court action against SP, and a state court action against CPC—seeking compensation for his personal injuries. Plaintiff obtained a judgment against SP in federal court, and SP paid the judgment in full. CPC then sought judgment in the state court action, urging that the action was barred by satisfaction of the federal judgment. The Court of Appeal agreed: "An injured person is entitled to only one satisfaction of judgment for a single harm, and full payment of a judgment by one tortfeasor discharges all others who may be liable for the same injury. This rule, designed to prevent double recovery and never-ending litigation by dissatisfied claimants, applies whether a single judgment has been obtained against joint or concurrent tortfeasors, whether separate judgments of equivalent or disparate amounts have been obtained against tortfeasors, or whether no other judgment has been obtained against other tortfeasors. [Citations.] It is beyond dispute that the allegations of plaintiff's complaint, if proved, made CPC a concurrent tortfeasor, liable for the same injury for which plaintiff has already recovered full compensation from SP. Accordingly, the trial court correctly ruled that satisfaction of the federal judgment discharged CPC from any liability it may have had to plaintiff." (*Id.* at pp. 99-100.)

## II.  *Jhaveri v. Teitelbaum*

Although it is well established that a plaintiff may recover for an injury only once, parties often do not agree (and judgments may not disclose) which losses or injuries are embraced by particular judgments. In such cases, determining the degree of overlap between related judgments—and thus the degree to which satisfaction of one judgment satisfies a related judgment as well—is necessarily an issue for judicial determination.

The court considered this issue in *Jhaveri v. Teitelbaum* (2009) 176 Cal.App.4th 740, 753-755 (*Jhaveri*). There, the plaintiffs filed suit against Steven Teitelbaum

(Teitelbaum), Los Angeles Coin Company, and Brian Dubois (Dubois) for breach of contract and fraud (*Jhaveri I*). The plaintiffs obtained a substantial jury verdict in their favor, consisting of: (1) compensatory damages of $1.2 million against all defendants, jointly and severally, for breach of contract and fraud; (2) punitive damages, in the amounts of $1 million against Dubois, $2 million against Teitelbaum, and $1 million against the Los Angeles Coin Company; and (3) prejudgment interest. (*Id.* at pp. 743-744.)

Just prior to the verdict in *Jhaveri I*, the plaintiffs discovered that Teitelbaum and Dubois had transferred community real property to their wives and made other conveyances to avoid collection of any judgment the plaintiffs might obtain. The plaintiffs then filed a second action, *Jhaveri II*, alleging fraudulent conveyances by Teitelbaum, Dubois, their spouses, and Los Angeles Coin Company. (*Jhaveri*, *supra*, 176 Cal.App.4th at p. 744.) Before that case went to trial, Dubois and his wife settled with the plaintiffs for $1 million, paid plaintiffs $245,000 under the settlement agreement, and then filed for bankruptcy. (*Ibid.*)

Teitelbaum and Los Angeles Coin Company (appellants) did not settle with plaintiffs, but sought an order requiring plaintiffs to execute and deliver a partial satisfaction of judgment in *Jhaveri I* in the amount of half the face value of the Dubois settlement, or $500,000. Appellants argued that the face amount of the settlement ($1 million) should be allocated equally between the joint and several liability for compensatory damages and Dubois's separate liability for punitive damages in *Jhaveri I*. Thus, they argued, $500,000 should be credited to the joint and several economic damages awarded in *Jhaveri I*. Plaintiffs opposed the motion, arguing that because Dubois's wife was also a party to the settlement and benefitted from the dismissal of the claims asserted against her in *Jhaveri II*, half the settlement funds should be attributed to extinguishing her obligations and half attributed to her husband's liability in *Jhaveri I*, with half of the latter amount (i.e., one-fourth of the amount actually paid, or $61,000), credited to Dubois's joint and several liability for the economic damages in *Jhaveri I*. The trial court agreed with the plaintiffs, attributed one-fourth of the settlement funds

8

actually received ($61,000) to the compensatory damages portion of the judgment, and ordered plaintiffs to file a partial satisfaction of judgment in the amount of $61,000. Appellants appealed. (*Jhaveri*, *supra*, 176 Cal.App.4th at pp. 746-748.)

The Court of Appeal affirmed. It explained that to prevent a double recovery, "equity demands credit be given for payments received on the judgment. Such a balance acts as an offset against the judgment. 'At common law, a setoff is based upon the equitable principle that parties to a transaction involving mutual debts and credits can strike a balance between them.' . . . The right of offset rests upon the inherent power of the court to do justice to parties appearing before it. [Citations.]" (*Jhaveri*, *supra*, 176 Cal.App.4th at p. 753.) An order under Code of Civil Procedure section 724.110 directing a plaintiff to execute and deliver a partial satisfaction of judgment "is the appropriate means by which a codebtor on a judgment may be credited with money received by the plaintiff in offset against the judgment." (*Id*. at p. 752.)[4]

Because a trial court's decision to apply a credit in partial satisfaction of a judgment is an exercise of the court's equitable discretion, it is abused only when, "in light of applicable law and considering all relevant circumstances, the court's ruling exceeds the bounds of reason." (*Jhaveri*, *supra*, 176 Cal.App.4th at p. 749.) The court found no such abuse of discretion in the case before it: "Because all or most of all of the Duboises' assets were being held in Connie Dubois's name and it was alleged she

---

[4] Code of Civil Procedure section 724.110 provides: "(a) The judgment debtor or the owner of real or personal property subject to a judgment lien created under a money judgment may serve on the judgment creditor a demand in writing that the judgment creditor execute, acknowledge, and deliver an acknowledgment of partial satisfaction of judgment to the person who made the demand. . . . If the judgment has been partially satisfied, the judgment creditor shall comply with the demand not later than 15 days after actual receipt of the demand. [¶] (b) If the judgment creditor does not comply with the demand within the time allowed, the judgment debtor or the owner of the real or personal property subject to a judgment lien created under the judgment may apply to the court on noticed motion for an order requiring the judgment creditor to comply with the demand. . . . If the court determines that the judgment has been partially satisfied and that the judgment creditor has not complied with the demand, the court shall make an order determining the amount of the partial satisfaction and may make an order requiring the judgment creditor to comply with the demand."

9

actively sought to defraud her husband's judgment creditors, she was vulnerable to claims for compensatory and punitive damages. Given that Dubois was effectively judgment proof at the time of the settlement, Connie Dubois was the only means by which the Jhaveris could hope to recover on their judgment against Dubois. The court therefore could reasonably allocate one-half of the potential exposure to Connie Dubois, and it did not err in so doing." (*Id.* at p. 755.)

### III.  The Trial Court Did Not Abuse Its Discretion by Denying Bluenose's Request for an Offset

Bluenose cites *Jhaveri* for the proposition that courts have the inherent power to credit payments made in satisfaction of one judgment against a second judgment as well—a proposition with which we agree. From this basic proposition, however, Bluenose would have us conclude that in the present case, the trial court had no discretion to do anything *other than* to order that all payments made "on the First State Court Judgment should be applied on the Second State Court Judgment, and vice versa." Such a request betrays a fundamental misunderstanding of *Jhaveri.* As we have said, all parties in *Jhaveri* agreed that the settlement payments made by one defendant should offset, at least to some degree, the money owed by the other defendants. Therefore, the dispute there was not *whether* the appellants were entitled to an offset, but how large the offset should be. As to that issue, the court said, the trial court had significant equitable discretion to "do justice" (*Jhaveri*, *supra*, 176 Cal.App.4th at p. 753)—that is, to determine the degree to which satisfaction of one judgment also satisfied (or partially satisfied) the other.

In the present case, Bluenose sought an order that "all payments" made to XTC in satisfaction of either the *Bluenose I* or *Bluenose II* judgment should be credited equally to both judgments. To enter such an order, the trial court would have to conclude that *all* of the damages awarded in *Bluenose II* duplicated those awarded in *Bluenose I.* However, Bluenose made no showing below, and makes none here, that the *Bluenose II* judgment was intended to compensate XTC for the very same losses embraced by the *Bluenose I*

10

award. To the contrary, Bluenose admits in its appellant's reply brief that "the [*Bluenose II*] judgment . . . did not delineate between special, general, or punitive damages," and it suggests that any attempt to determine the basis for the *Bluenose II* judgment "is pure speculation."

We presume that the two judgments overlapped at least in part—after all, the basis for the fraudulent conveyance claim alleged in *Bluenose II* was that Bluenose transferred to 8600 the sum of $505,000 that otherwise would have been available to satisfy the *Bluenose I* judgment. To the extent, however, that in addition to these pass-through damages, the *Bluenose II* judgment also awarded punitive damages, attorney fees, or any other damages not embraced in *Bluenose I*, XTC would be entitled to recover these damages *in addition to* those awarded in *Bluenose I*. Because it was reasonable for the trial court to conclude that the *Bluenose II* judgment included some damages not embraced by the *Bluenose I* award, its denial of Bluenose's motions manifestly was not an abuse of discretion.

Our conclusion here should not be read to suggest that we believe there is no overlap between the two judgments, or that Bluenose is not entitled to set off any portion of its satisfaction of one judgment against the other. The extent to which it may do so, however, must be determined by the trial court in the first instance. Plaintiff must seek such a determination, moreover, if it does so at all, pursuant to an appropriate procedural vehicle, such as (as in *Jhaveri*) a motion pursuant to Code of Civil Procedure section 724.110 to execute and deliver a partial satisfaction of judgment.[5]

---

[5] In light of our disposition, we deny Bluenose's request to remand this case to the trial court "for a determination of the equity which the judgment creditor received and which should be applied to both of the judgments."

## DISPOSITION

The order is affirmed.  XTC shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, J.[*]

We concur:


EPSTEIN, P. J.


WILLHITE, J.

---

[*]  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12